**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AVAYA INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | C.A. No. 1:12-cv-00191- RGA-SRF |
| SNMP RESEARCH INTERNATIONAL, INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |

---

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR PRELIMINARY INJUNCTION**

THORP REED & ARMSTRONG, LLP
Karen M. Grivner (4372)
Gregory W. Hauswirth (5679)
824 Market Street, Suite 710
Wilmington, DE  19801
Telephone:   (302) 250-4750
Facsimile:    (302) 421-9439
Email:  kgrivner@thorpreed.com
Email:  ghauswirth@thorpreed.com

Dennis Hopkins
PERKINS COIE LLP
30 Rockefeller Plaza, 25th Floor
New York, NY  10112
Telephone:   (212) 262-6900
Facsimile:    (212) 977-1649
Email:  dhopkins@perkinscoie.com

John L. Wood
EGERTON MCAFEE ARMISTEAD & DAVIS, P.C.
900 S. Gay Street
Knoxville, TN  37902
Telephone:   (865) 546-0500
Facsimile:    (865) 525-5293
Email:  jwood@emlaw.com

*Attorneys for Defendant*
*SNMP Research International, Inc.*

## TABLE OF CONTENTS

I.      NATURE AND STAGE OF PROCEEDINGS ................................................................. 1

II.     SUMMARY OF ARGUMENT .................................................................................... 1

III.    FACTUAL BACKGROUND........................................................................................ 3

    A.    Background on SNMPRI and the Software it Licenses......................................... 3

    B.    SNMPRI and Avaya Are Parties to the License Agreement ................................. 4

    C.    Avaya Ceased Paying and Underpaid Royalties to SNMPRI, and Also
        Underreported Its Shipments of Products Containing the Software...................... 5

    D.    SNMPRI Terminated Avaya's Rights Under the License Agreement In
        Good Faith and In Accordance With the License Agreement's Terms ................ 6

    E.    Avaya Continues to Use SNMPRI's Software Without a License ...................... 10

    F.    The Litigation between SNMPRI and Avaya ..................................................... 11

IV.     ARGUMENT............................................................................................................ 12

        1.    Avaya Is Not Entitled to Equitable Relief Because It Has Unclean
            Hands ................................................................................................... 12

        2.    There Is No Likelihood That Avaya Will Prevail.................................... 15

        3.    Avaya Will Not Suffer Irreparable Harm ............................................... 16

        4.    The Balance of Hardships Weigh In Favor of SNMPRI ......................... 18

        5.    The Public Interest Weighs Against an Injunction ................................. 19

        6.    Other Factors Weigh Against Granting Avaya's Motion ........................ 20

V.      CONCLUSION......................................................................................................... 20

# TABLE OF AUTHORITIES

CASES

*2660 Woodley Road Joint Venture v. ITT Sheraton Corp.*,
No. 97-450 JJF, 1998 WL 1469541 (D. Del. Feb. 4, 1998) ....................................................16

*Adams v. Freedom Forge Corp.*,
204 F.3d 475 (3d Cir. 2000)......................................................................................................16

*Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*,
669 F.3d 359 (3d Cir. 2012)...............................................................................................12, 15

*Arthrex, Inc. v. dj Orthopedics LLC*,
No. CIV.A. 02-67 GMS, 2002 WL 818062, at *4 (D. Del. Apr. 30, 2002) ............................16

*Benitec Austl. Ltd. v. Promega Corp.*,
No. Civ. A. 04-889 JJF, 2005 WL 549552, at *7 (D. Del. Mar. 8, 2005) ...............................19

*Bennington Foods LLC v. St. Croix Renaissance Grp., LLP*,
528 F.3d 176 (3d Cir. 2008).............................................................................................12, 16

*Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co.*,
668 F.Supp. 906 (D. Del. 1987)...............................................................................................16

*ECRI v. McGraw-Hill, Inc.*,
809 F.2d 223 (3d Cir. 1987)......................................................................................................16

*Farmers & Merchants Bank v. Templeton*,
646 S.W.2d 920 (Tenn. Ct. App. 1983).....................................................................................13

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*,
847 F.2d 100 (3d Cir. 1988)................................................................................................12, 16

*G. Neil Corp. v. Cameron*,
No. Civ. A. 03-4419, 2003 WL 22533698 , at *1 (E.D. Pa. Oct. 21, 2003)......................12, 13

*Howmedica Osteonics v. Zimmer Inc.*,
Nos. 11-2342, 11-2343, 2012 WL 477624 (3d Cir. Feb. 15, 2012) .........................................16

*JGT Corp. v. Andrews*,
No. M1999-01395-COA-R3-CV, 2000 WL 546347 (Tenn. Ct. App. May 5, 2000).............13

*Kyphon, Inc. v. Disc-O-Tech Med. Tech., Ltd.*,
No. Civ. A. 04-204 JJF, 2004 WL 2898064, at *6 (D. Del. Dec. 10, 2004) .........................19

*Liveware Publ'g Inc. v. Best Software Inc.*,
125 Fed. App'x 428 (3d Cir. 2005).......................................................................................18

*Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*,
    315 S.W.3d 800 (Tenn. Ct. App. 2009) .................................................................16

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
    290 F.3d 578 (3d Cir. 2002) ..................................................................................18

*Opticians Ass'n of Am. v. Independent Opticians of Am.*,
    920 F.2d 187 (3d Cir. 1990) ..................................................................................16

*P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC*,
    428 F.3d 504 (3d Cir. 2005) ..................................................................................12

*Power Integrations, Inc. v. Farichild Semiconductor Intern., Inc.*,
    C.A. No. 04-1371-JJF, 2008 WL 5210843 (D. Del. Dec. 12, 2008) ......................16

*Salomon Smith Barney Inc. v. Vockel*,
    137 F.Supp.2d 599 (E.D. Pa. 2000) ......................................................................13

*Stryker v. Hi-Temp Specialty Metals, Inc.*,
    No. 11-6384, 2012 WL 715179 (D.N.J. Mar. 2, 2012) ..........................................16

*Sun Microsystems, Inc. v. Versata Enterprises, Inc.*,
    630 F.Supp.2d 395 (D. Del. 2009) ........................................................................13

**RULES**

Fed. R. Civ. P. 68 ........................................................................................................10, 14

Fed. R. Evid. 408 ............................................................................................................6

## I.    NATURE AND STAGE OF PROCEEDINGS

Plaintiff Avaya Inc. ("Avaya") commenced this action by filing the Complaint on February 14, 2012.    In its Complaint, Avaya claims that defendant SNMPR Research International, Inc. ("SNMPRI") has breached a license agreement between the parties (the "License Agreement") that gave Avaya the right to copy and distribute certain products containing copyrighted software that SNMPRI licenses.   Avaya contends that, even though it failed to pay substantial royalties for many years, underpaid royalties, concealed from SNMPRI the true amount of royalties owed, and failed to cure these defaults within the contractually specified time period, SNMPRI somehow acted in bad faith when it terminated Avaya's license rights on February 1, 2012.

On March 9, 2012, SNMPRI filed (i) a motion to dismiss this case due to a lack of personal jurisdiction or, alternatively, to transfer this case to the Eastern District of Tennessee (D.I. 7); and (ii) a motion to dismiss this case for failure to state a claim and to strike Avaya's references to the parties' settlement discussions (D.I. 8).   Those motions are pending.   On April 16, 2012, with the issues relating to jurisdiction, venue and transfer still unresolved, Avaya filed the instant motion for a preliminary injunction, which SNMPRI hereby opposes.[1]

## II.    SUMMARY OF ARGUMENT

Through the instant motion for a preliminary injunction, plaintiff Avaya, with unclean hands, asks the Court to excuse its long-standing and material breaches of its License Agreement with SNMPRI and to allow Avaya to continue to reap the benefits of the Software it licensed from SNMPRI without paying for the right to do so like everyone else.   On November 1, 2011, SNMPRI notified Avaya that it was in default of the License Agreement because Avaya had not

---

[1] By opposing Avaya's motion for a preliminary injunction, SNMPRI does not waive its personal jurisdiction objections or position that this case should be transferred to the Eastern District of Tennessee.

made a single royalty payment to SNMPRI in almost two years and owed SNMPRI hundreds of thousands—if not many millions—of dollars in unpaid royalties and interest.  Under the terms of the License Agreement, Avaya then had 45 days to cure its default.  Avaya nevertheless failed to pay (and still has not paid) to SNMPRI any, let alone all, of the unpaid royalties it admittedly owes, as well as interest.  Consequently, in accordance with the License Agreement's termination provisions, on February 1, 2012, SNMPRI terminated Avaya's right to make copies of the Software and to distribute products containing the Software.  In light of these facts, Avaya is not entitled to the injunction it seeks for the following reasons:

(1)     Avaya has unclean hands due to its willful, material breaches of the License Agreement and clear pattern of misreporting the true amount of royalties it owed to SNMPRI. Therefore, Avaya should not receive the equitable remedy of a preliminary injunction.

(2)     Avaya has failed to, and cannot, demonstrate that it is entitled to a preliminary injunction because, among other reasons detailed herein, (i) it is not likely to prevail on the merits because SNMPRI, unlike Avaya, has complied with the License Agreement; (ii) there is no evidence that Avaya will suffer immediate, irreparable harm; and (iii) SNMPRI is the true victim in this case and would suffer tremendous harm if Avaya were granted leave to use and distribute SNMPRI software without a license and without paying royalties.

(3)     The record is clear that SNMPRI acted in good faith and in total conformity with the letter and spirit of the agreed-upon License Agreement.  In fact, SNMPRI went beyond its contractual duties by trying, without success, to reach cooperative resolutions with Avaya even after it failed to make any curative payments during the 45-day cure period.  Negotiations between the parties broke down due to Avaya's continued stalling, failure to pay unpaid royalties and refusal to open its records so that SNMPRI could ascertain the true amount of money that

Avaya had wrongfully failed to pay.  Thus, the negotiations ended because Avaya did not participate in good faith.

## III.   FACTUAL BACKGROUND

**A.   Background on SNMPRI and the Software it Licenses.**

In 1988, Dr. Jeff Case, a computer center administrator and computer science professor at the University of Tennessee, co-founded the company that would later become SNMP Research, Inc. ("SNMPR"). (J. Case Aff. ¶ 2.[2])  Nearly 25 years later, SNMPR remains a private, closely-held Tennessee corporation. (*Id.* at ¶ 3.)  SNMPR is still based on the Tennessee farm where Dr. Case and his family live.  It is a family business – but one that has achieved great success due to the important and highly valuable software at issue in this case. (*Id.*)

SNMPR takes its name from the acronym for Simple Network Management Protocol (the "Protocol"). (*Id.* at ¶ 4.)  Dr. Case played an instrumental role in developing the Protocol, which allows connected devices to share information. (*Id.*)  For example, a laser printer might communicate with a connected computer by using the Protocol to transmit messages about the printer's status (*e.g.*, it is offline, it needs paper, it is busy, etc.). (*Id.*)  Due in no small part to the efforts of Dr. Case, the Protocol is now used ubiquitously in connected computing devices throughout the world. (*Id.*)  SNMPR created a state-of-the-art software program that implements the Protocol (the "Software"), and SNMPR's primary assets are the intellectual property relating to that Software. (*Id.* at ¶ 5.)  Among other things, SNMPR holds the copyrights to the individual files that comprise the Software. (*Id.*)

In 1994, SNMP Research International, Inc. ("SNMPRI") was created to license and support SNMPR's Software. (*Id.* at ¶ 6.)  It is a private, closely-held company that was founded by Dr. Case's wife, who is now SNMPRI's President and Chief Executive Officer. (*Id.*)  It is

---

[2] "J. Case Aff." refers to the Affidavit of Dr. Jeff Case in Opposition to Motion for Preliminary Injunction.

568576v11

based on the same Tennessee farm as SNMPR and currently employs eight employees.[3] (M. Case Aff. ¶¶ 3, 4.)[4] SNMPRI holds the copyrights to the collections and compilations of various files that comprise the Software. (J. Case Aff. ¶ 7.) SNMPRI licenses and distributes the Software to many governmental and private entities, including some of the biggest computer and telecommunications companies in the world. (*Id.*) SNMPRI's licensed customers generally use the Software directly or incorporate it into their products. (*Id.*) In 2011, SNMPRI's gross revenues were under $5 million, the bulk of which was from license fees and royalties from licensing the Software to others.. (M. Case Aff. ¶ 5.)

**B.     SNMPRI and Avaya are Parties to the License Agreement.**

On March 14, 1995, SNMPRI executed a license agreement for the Software with AT&T Corp.-GBCS (the "License Agreement").[5] (J. Case Aff. ¶ 8; License Agreement, J. Case Aff. Ex. A.) Effective May 14, 1996, AT&T Corp.-GBCS transferred the License Agreement to Lucent Technologies Inc. BCS. (J. Case Aff. ¶ 9.) On September 28, 2000, Lucent Technologies Inc. BCS assigned the License Agreement to Avaya Inc. ("Avaya").[6] (*Id.* at ¶ 9; Ltr. from Sherry Ripley to John Southwood, J. Case Aff. Ex. B.) Based in Basking Ridge, NJ (Cmpl. ¶ 1), Avaya is a "leading global provider of next-generation business collaboration and communications solutions." (Cote Decl. ¶ 2.[7]) Avaya is a large, multinational corporation that employs over 18,500 employees worldwide, has 9,600 channel partners, and, in 2011 alone, generated over $5.5 billion in revenue. (*Id.* at ¶¶ 5-7.)

---

[3] SNMPR and SNMPRI are operated as distinct corporations, with no common officers, common directors or common employees. (J. Case Aff. ¶ 6.)

[4] "M. Case Aff." refers to the Affidavit of Mary Case in Opposition to Motion for Preliminary Injunction.

[5] Although the License Agreement was designated "LDR-C36E" when it was signed, it was later renamed as agreement "L4U146D" and, eventually, "MR12000366." (J. Case Aff. ¶ 8.)

[6] Although Avaya claims that "SNMP software has been a component of Avaya communications products for over 15 years" (Avaya Br., D.I. 17, at 4), that is untrue. Avaya has not even existed for 15 years, and it did not obtain rights under the License Agreement until roughly 12 years ago. (J. Case Aff. ¶ 9.)

[7] "Cote Decl." or "Cote Declaration" refers to the Declaration of Michel Cote in Support of Avaya Inc.'s Motion for a Preliminary Injunction, dated April 16, 2012 (D.I. 19).

568576v11

-4-

The License Agreement required Avaya to pay royalties to SNMPRI "for each binary copy produced and distributed which contains all, some, or part of the Program or Derivative Works thereof." (License Agreement, J. Case Aff. Ex. A, § 28(c).) Avaya was obliged to pay royalties on a quarterly basis receiving invoices from SNMPRI. (*Id.* at § 28(e).) The License Agreement also provided that Avaya was required to maintain and, upon request, transmit to SNMPRI information that would verify the accuracy of the royalties it paid. (*Id.* at § 31(a),(b).)

The License Agreement could not be modified except by a writing signed by both parties. (*Id.* at ¶ 24(a).) Throughout the years, the License Agreement has been amended many times in writing to specify the particular Software that Avaya is allowed to use for certain identified Avaya products. (J. Case Aff.¶ 10; License Agreement § 28(c).) The amendments often allowed Avaya to incorporate the Software into certain additional products that were not previously covered by the License Agreement, provided it paid license fees and royalties for doing so. (J. Case Aff. ¶ 10.) In these amendments, the parties revised many of the License Agreement's fundamental terms. (*Id.*) However, Avaya did not then–or at any time thereafter–modify or amend the License Agreement's termination provisions. (*Id.*)

**C.   Avaya Ceased Paying Royalties, Underpaid Royalties to SNMPRI, and also Underreported Its Shipments of Products Containing the Software.**

For a number of reasons, SNMPRI has reason to believe that Avaya has breached the License Agreement by underreporting, underpaying or not paying royalties at all since as early as 2002. (J. Case Aff. ¶¶ 11-13.) Despite Avaya's unambiguous and indisputable obligation to pay royalties to SNMPR, and despite the fact that Avaya continues to create and ship products containing the Software (*see* Cote Decl. ¶¶ 9, 34), Avaya nevertheless has failed to pay any royalties to SNMPRI between early 2010 (royalties related to Software that was shipped in the fourth calendar quarter of 2009) and the present. (J. Case Aff. ¶ 11.) Moreover, in calendar year

568576v11

2008, Avaya reported to SNMPRI that Avaya had shipped a total of two royalty bearing

products, even though in 2011, Avaya informed SNMPRI that in 2008 it actually shipped over

62,000 royalty-bearing units containing SNMPRI Software.[8] (J. Case Aff. ¶ 12.)

Critically, in the instant motion for preliminary injunction, Avaya does not claim that it

has paid to SNMPRI all of the royalties owed to it under the License Agreement. Quite to the

contrary, as discussed in further detail below, Avaya has *admitted* to owing SNMPRI at least

several hundred thousand dollars in unpaid royalties, and SNMPRI reasonably believes that the

true amount that Avaya owes in unpaid royalties will amount to many millions of dollars once

the true number of royalty bearing products shipped by Avaya is identified. Consequently,

Avaya does not–and cannot–deny that it materially breached the License Agreement.

**D.     SNMPRI Terminated Avaya's Rights Under the License Agreement In Good Faith
and In Accordance With the License Agreement's Terms.**

On November 1, 2011, in accordance with ¶ 18(b) of the License Agreement, SNMPRI

provided Avaya with notice that it was in breach of the License Agreement.[9] (Wood Decl. ¶ 2;

Ltr. from John Wood to Barry Marcus (Nov. 1, 2011,) Wood Decl. Ex. A (the "Notice of

Default").)[10] Pursuant to paragraph 18(b) of the License Agreement, Avaya then had 45 days to

"correct such conditions" (*i.e.*, to cure the breach). (License Agreement, §18(b).) If Avaya failed

to do so, the License Agreement provided that SNMPRI had the right to "terminate the Internal

---

[8] Avaya provided the referenced shipping figures during a December 14, 2011 meeting (discussed in further detail herein). The December 14th meeting, and the parties' communications relating thereto, were intended to be settlement communications subject to Federal Rule of Evidence 408. (Wood Decl. ¶ 4.) However, Avaya has opened the door to admitting evidence of that meeting and related communications by discussing, and mischaracterizing, them in its motion. (*See* Avaya Br., D.I. 17, at 6-9.) Moreover, Avaya has placed SNMPRI's intentions and state of mind directly at issue. The substance of the December 14th meeting and related communications prove that SNMPRI acted in good faith when terminating Avaya's rights. Furthermore, subsequent to Avaya's filing of the instant motion, Avaya's counsel refused to enter a stipulation that would have prevented the parties from making additional references in Court filings to the December 14th meeting and communications related thereto. (Wood Decl. ¶ 4.)

[9] Avaya makes the bold claim that the notice of default was "faulty," without ever explaining why. (*See* Avaya Br., D.I. 17, at 1.) The Notice of Default complied in all respects with the License Agreement and prevailing law.

[10] "Wood Decl." refers to the Declaration of John Wood in Opposition to Motion for Preliminary Injunction.

568576v11

-6-

Use and Redistribution Rights" found in the License Agreement. (*Id.*)

Avaya *did not cure* the breach within 45 days after receiving the Notice of Default. (J. Case Aff. ¶¶ 11, 13.) In fact, to date, Avaya still has not (i) paid to SNMPRI a single dollar for royalties owed to it since January 2010, or (ii) made the back payments relating to Avaya's underreported shipments of products containing the Software. (J. Case Aff. ¶¶ 11, 13.)

Instead of taking SNMPRI's Notice of Default seriously, Avaya waited until December 3, 2011, over 32 days after Avaya received the notice, to contact SNMPRI to request a meeting to discuss its breach. (Wood Decl. ¶ 3.) SNMPRI agreed, and participated in a meeting with Avaya in Knoxville, Tennessee on December 14, 2011. (J. Case Aff. ¶¶ 14-16.) At the December 14, 2011 meeting, and in all subsequent discussion with Avaya, SNMPRI was very upfront about its intentions and objectives. It wanted Avaya to immediately pay the full amount that it was owed under the License Agreement, and, due to Avaya's chronic and material delinquency, SNMPRI insisted that it be permitted to review Avaya's software and records to determine the true number of royalty-bearing products that Avaya had shipped. (J. Case Aff. ¶ 14.) This request was nothing out of the ordinary; Avaya had already agreed to similar obligations in the License Agreement. (J. Case Aff. ¶ 14; License Agreement § 31(a), (b).)

At the December 14th meeting, Avaya conceded that it owed SNMPRI at least $325,000 in unpaid royalties under the License Agreement expressed its willingness to pay that amount upon the signing of a standstill agreement. (J. Case Aff. ¶ 15.) This amount was not an approximation of what Avaya owed to SNMPRI; it was intended to be a much warranted show of good faith on Avaya's part. (*Id.*) The parties discussed treating that initial $325,000 as a down payment on the full amount of royalties that Avaya owed, which could only be determined after further analysis of Avaya's software and records. (*Id.*) Thus, the parties also discussed Avaya's

allowing SNMPRI to perform a forensic evaluation of (i) the products sold by Avaya to determine which contain the Software and (ii) the Avaya accounting system to determine how many units of such products had been shipped by Avaya. (*Id.*) The parties also tentatively agreed that Avaya would reimburse SNMPRI for the costs of the forensic analysis, and that after the analysis was completed, the parties would discuss the settlement of their dispute. (*Id.*)

During the December 14th meeting, the parties also expressed their willingness to enter into a written agreement pursuant to which SNMPRI would forbear from terminating the license rights under the License Agreement while the aforementioned forensic analysis and settlement discussions occurred (*i.e.*, the written "standstill" agreement referred to during the December 14th meeting). (J. Case Aff. ¶ 16.) Avaya personnel at the meeting represented that they did not have sufficient authority to agree to the terms and conditions discussed. (*Id.*) The discussion at the December 14th meeting was reflected in an e-mail exchange between counsel for SNMPRI and Avaya on December 15 and 16, 2011. (Wood Decl. ¶ 5; E-mail from John L. Wood to Joseph Dearing (Dec. 15, 2011, 11:23 EST), Wood Decl. Ex. B; E-mail from Joseph F. Dearing to John L. Wood (Dec. 16, 2011, 13:57 EST), Wood Decl. Ex. C.) On January 6, 2012–by which time the 45-day notice period had already expired and SNMPRI already had the contractual right to terminate Avaya's license rights–counsel for SNMPRI sent a draft of the "standstill" agreement to Avaya in an effort to cooperatively resolve the parties' dispute. (Wood Decl. ¶ 6; E-mail from John L. Wood to Joseph F. Dearing (Jan. 6, 2011, 17:52 EST), Wood Decl. Ex. D; Unexecuted Draft Ltr. from Mary Case & Jeff Case to Avaya Inc., Wood Decl. Ex. E.) The draft contained terms that were both reasonable and consistent with the parties' discussion during the December 14th meeting (as described above). (Wood Decl. ¶ 7; J. Case Aff. ¶ 17.) By its own terms, SNMPRI's offer to enter such an agreement with Avaya expired on

January 15, 2012. (Wood Decl. <u>Exh. E</u> at p. 2.) At no point in time, however, did the parties ever sign this, or any other version of the draft letter (or, as Avaya calls it, "standstill") agreement. (Wood Decl.¶ 7; J. Case Aff. ¶ 17.)

Avaya did not respond to the proposed agreement sent by SNMPRI until January 27, 2012, when Avaya apparently rejected the SNMPRI proposal and counter-proposed its own version of the "standstill" agreement by sending to SNMPRI a substantially different draft. (Wood Decl. ¶ 8; Revised Unexecuted Draft Ltr. from Mary Case & Jeff Case to Joseph Dearing, Wood Decl. <u>Ex. F</u>.) Avaya's proposal bore little relationship to the parties' discussions during the December 14, 2011 meeting. (Wood Decl. ¶ 8; J. Case Aff. ¶ 18.) Among other things, Avaya's proposal contained the following new terms, which the parties had never discussed:

- Rather than immediately paying all unpaid royalties upon signing the agreement, Avaya would require SNMPRI to issue an invoice after the agreement was signed – which (a) would create an intolerable scenario where SNMPRI had agreed to forbear its rights against Avaya even though it had not yet been paid the money it indisputably was owed, and (b) would cause further delays (J. Case Aff. ¶ 18);

- Imposed a number of unacceptable limitations on the audit, including that (a) it would only cover the period from January 1, 2008 through December 31, 2011; and (b) Avaya did not allow SNMPRI to conduct the review of Avaya's source code libraries in order to assess the extent to which Avaya was using software -- rather, Avaya wanted the review to be performed by Avaya personnel subject to limited review by an SNMPRI engineer (*id.*); and

- In the event that SNMPRI terminated Avaya's license rights, Avaya would not honor its obligation to reimburse SNMPRI for the costs of the audit (*id.*).

Avaya's revised draft of the letter agreement was unacceptable. (*Id.*) Avaya already had a pre-existing obligation to pay royalties to SNMPRI, which, rather than pay, Avaya tried to use as a bargaining chip.[11] This was a clear indication of Avaya's bad faith. Consequently, on

---

[11] Notably, Avaya's draft agreement recited that the amount it "believe[d]" was owed to SNMPRI was $424,780. (Wood Decl. <u>Ex. F</u> at p. 1.) This figure was approximately $100,000 more than the amount ($325,000) that was discussed during the December 14th meeting. The fluctuation in Avaya's calculations was further indication to SNMPRI that Avaya had not thoroughly and reliably analyzed and calculated the amount of unpaid

568576v11

February 1, 2012—over 90 days after SNMPRI had sent the default notice, Avaya having failed to cure or act in good faith—SNMPRI sent Avaya a written notice that its right to use and re-distribute the Software under the License Agreement had been terminated. (Wood Decl. ¶ 9; Ltr. from John L. Wood to Joseph Dearing (Feb. 1, 2012), Wood Decl. Ex. G.[12])

After SNMPRI had terminated Avaya's license rights, Gary Barnett, an Avaya Senior Vice President and General Manager, contacted SNMPRI regarding the settlement of the parties' dispute.[13] (J. Case Aff. ¶ 21.) In response to Mr. Barnett's assurance that Avaya wanted to negotiate a settlement, SNMPRI proposed a new version of the standstill agreement and a temporary license agreement that would be effective while the parties negotiated. (*Id.*) Avaya did not agree to SNMPRI's proposal. (*Id.*) Contrary to Avaya's false characterizations, SNMPRI's post-termination discussions with Avaya were not in bad faith, nor were they an attempt to assert unfair leverage. (*Id.*) It is Avaya that failed to negotiate with SNMPRI and instead of responding to SNMPRI's good faith proposal of a revised standstill agreement and a temporary license agreement, Avaya filed this lawsuit.

## E.   Avaya Continues to Use SNMPRI's Software without a License.

Subsequent to the termination of its rights under the License Agreement, Avaya has continued to copy and redistribute the Software. Avaya's products that historically contained the Software are still on the market. (*Id.* ¶ 22.) During the December 14th meeting, Avaya expressed its intention to continue shipping products that contained the Software and indicated that Avaya had shipped over 58,000 royalty-bearing products in 2010 and over 40,000 such products in

---

royalties it owed to SNMPRI, thus drawing doubt upon the accuracy of Avaya's reports. (J. Case. Aff. ¶ 19.)

[12] To be precise, SNMPR terminated Avaya's right to use and re-distribute the Software as set forth in the License Agreement. It did not terminate the entirety of the License Agreement.

[13] Avaya's reference to the parties' post-February 1 discussions is immaterial. By that time, SNMPRI had already terminated Avaya's rights under the License Agreement. Notably, however, Avaya mischaracterizes those discussions. (*See* J. Case Aff. ¶ 21.) Avaya also refers to its Rule 68 Offer of Judgment, which (i) is procedurally improper because only a party defending against a claim may make an offer of judgment (Fed. R. Civ. P. 68), and (ii) confirms that Avaya recognizes that it owes at least hundreds of thousands of dollars in back royalties.

568576v11

-10-

2011. (*Id.*)  Moreover, Avaya's opening brief identifies at least 20 new customers who "in 2011, would have been impacted by a stop-shipment." Yet to this date, Avaya has not paid SNMPRI royalties owed for these shipments, drawing doubt on the urgency of Avaya's claims. (*Id.*)

**F.      The Litigation between SNMPRI and Avaya.**

There are currently three separate legal actions involving SNMPRI and Avaya.  The first is an adversary claim filed in the *In re: Nortel Networks Inc., et al.* bankruptcy action. *SNMP Res. Int'l, Inc. v. Nortel Networks, et al*, (*In re Nortel Networks, et. al*), Ch. 11, Case No. 09-10138-KG, Adv. Proc. No. 11-53454 (Bankr. D. Del. Nov. 2, 2011).  The bankruptcy proceeding addresses Avaya's failure to pay license fees or royalty payments to SNMPRI with respect to a different set of products from those that were covered by the License Agreement and at issue in this case.[14]

On February 14, 2012, Avaya commenced the instant action, which is described in Section I, above.  On March 9, 2012, SNMPRI and SNMPR filed an action against Avaya in the Eastern District of Tennessee for copyright infringement and breach of the License Agreement. (*See SNMP Res., Inc. v. Avaya Inc.*, No. 12-cv-00109-RGA (E.D.Tenn. Mar. 9, 2012), Wood Decl. Ex. H.)  In contrast to the instant action, the Tennessee action (a) involves SNMPR, in addition to SNMPRI, as a party, and (b) is tailored to fully resolve the parties' dispute vis-à-vis the License Agreement because it addresses not just contractual issues between Avaya and SNMPRI, but also issues concerning Avaya's infringement of copyrights owned by SNMPR as well as copyrights owned by SNMPRI.

---

[14] With respect to Avaya, SNMPRI's claims in the bankruptcy case center around Avaya's unauthorized use and distribution of products that it obtained from Nortel in the bankruptcy that contain SNMPRI Software.  (Cmpl. ¶ 14). Avaya obtained a temporary, royalty bearing right to distribute some but not all of the software it obtained from Nortel containing SNMPRI Software by virtue of an Accession Agreement with SNMPRI.  The Accession Agreement expired on February 15, 2011, without Avaya reporting or paying accrued royalties. (J. Case Aff. ¶ 25.) The instant action does not contain any causes of action relating to the software that Avaya obtained from Nortel.

568576v11

## IV.    ARGUMENT

"The grant of injunctive relief is an extraordinary remedy ... which should be granted only in limited circumstances." *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100 (3d Cir. 1988) (citations omitted).  First, the party seeking equitable relief must not have unclean hands. *G. Neil Corp. v. Cameron*, No. Civ. A. 03-4419, 2003 WL 22533698, at *1 (E.D.Pa. Oct. 21, 2003).  Next, "A court must consider four factors when ruling on a motion for preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting preliminary relief will be in the public interest." *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012) (quotations omitted).

"The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate." *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005).  Moreover, where, as here, "the relief ordered by the preliminary injunction is mandatory and will alter the status quo [*i.e.*, by Avaya's seeking to "undo" SNMPR's termination of Avaya's rights under the License Agreement], the party seeking the injunction must meet a higher standard . . . ." *Bennington Foods LLC v. St. Croix Renaissance Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008).[15]

### 1.    Avaya Is Not Entitled to Equitable Relief Because It Has Unclean Hands.

Avaya has asked this Court to exercise its broad equitable powers and to grant Avaya a preliminary injunction that would allow Avaya to ignore the terms of the License Agreement. Avaya's license rights under the License Agreement were terminated because of Avaya's bad

---

[15] Notably, the situation might have been different if Avaya had sought injunctive relief before SNMPRI exercised its termination rights on February 1, 2010. In this respect, Avaya's motion for a preliminary injunction comes too late.  It seeks to undo an action that has already occurred.
568576v11

faith conduct, a path of deception that began long before its license rights were terminated. (*See* §§ III(C)-(E), *supra.*) Avaya disregarded SNMPRI's Notice of Default, and continued with its pattern of selling equipment containing SNMPRI's Software without paying. (*See id.*) Such conduct was willful, abusive and done in bad faith. Even as it seeks the equity of this Court, Avaya still continues to sell products containing SNMPRI's Software without paying royalties and with knowledge that it has underreported royalties to SNMPRI for years. (*See id.*) Avaya now wants the Court to endorse its wanton and abusive bad faith behavior. Avaya's motion for a preliminary injunction should be denied due to Avaya's unclean hands.

The doctrine of unclean hands applies when "(1) a party seeking affirmative relief (2) is guilty of conduct involving fraud, deceit, unconscionability, or bad faith (3) directly related to the matter in issue (4) that injures the other party (5) and affects the balance of equities between the litigants." *Sun Microsystems, Inc. v. Versata Enterprises, Inc.*, 630 F.Supp.2d 395, 410 (D. Del. 2009). This doctrine prevents a party who has breached a contract from obtaining an injunction enforcing the contract because a party with unclean hands has no standing in equity[16] *see G. Neil Corp.*, 2003 WL 22533698, at *1, and "a court sitting in equity . . . will not aid a wrongdoer." *Salomon Smith Barney Inc. v. Vockel*, 137 F.Supp.2d 599, 604 (E.D.Pa. 2000) (denying motion for preliminary injunction based on movant's unclean hands).

Under the *Sun Microsystems* test, Avaya has unclean hands and should be barred from equitable relief. *First*, Avaya seeks affirmative relief. *Second*, because of Avaya's pattern of deceit and bad faith conduct, SNMPRI terminated Avaya's rights under the License Agreement. Nevertheless, Avaya asks this Court to use its equitable powers to "un-terminate" its rights.

---

[16] Notably, Tennessee's courts, like the Courts in the Third Circuit, recognize the unclean hands defense to equitable relief. *See, e.g., Farmers & Merchants Bank v. Templeton*, 646 S.W.2d 920, 924 (Tenn. Ct. App. 1983) ("Once found to exist, the doctrine of unclean hands repels the unclean plaintiff at the steps of the Courthouse."); *see also JGT Corp. v. Andrews*, No. M1999-01395-COA-R3-CV, 2000 WL 546347 (Tenn. Ct. App. May 5, 2000).

568576v11

-13-

*Third*, Avaya's own deceitful conduct is directly related to the matter in issue. Avaya's false reports and failure to pay appropriate royalties (*see* § III(C), *supra*) constitute breaches under the License Agreement that resulted in the termination of Avaya's licensing rights. Even when served with the Notice of Default, Avaya failed to cure within the prescribed cure period, or even to this day. As a result of Avaya's bad faith conduct, SNMPRI had no other choice but to terminate Avaya's rights under the License Agreement, the matter in issue.

*Fourth*, for years SNMPRI has had to do without the royalties justly due to it from Avaya. SNMPRI has lost what it now estimates to be millions of dollars of revenue. This financial harm is solely due to Avaya's deceit with respect to reporting its sales and lost revenue, and Avaya's failure to pay royalties due to SNMPRI, both reported and unreported.

*Fifth*, Avaya's bad faith conduct has clearly shifted the equities because Avaya's conduct is far more inequitable and unjust than anything that SNMPRI has been accused of by Avaya. For years Avaya has made sales and gained market share in its industry by selling products that included the Software and reaping valuable revenue from these sales. Yet, during that time, Avaya engaged in a pattern of reporting deceptive sales figures and failing to pay royalties due, thus depriving SNMPRI of the benefit of the bargain between the parties.

Even Avaya's actions since the inception of this action reveal its bad faith. For example Avaya's purported Rule 68 Offer of Judgment (Gupta Decl., D.I. 18, Ex. A), is not just procedurally improper,[17] but it also shows that Avaya continues to act as if it is proper to trade an offer to pay debt that it already owes in exchange for even more consideration on the part of SNMPRI. Essentially, Avaya is offering to pay only a portion of the debt that it rightfully owes in exchange for complete relief from liability for incorporating the Software into an unknown

---

[17] Under Federal Rule of Civil Procedure 68(a), only a "party defending against a claim" may serve an offer of judgment. Because Avaya is not defending against any claim in this case, its offer of judgment is clearly not made pursuant to Rule 68.

number of "CM" and "Gateway" products.  This is an unconscionable act of pure bad faith.

**2.      There Is No Likelihood That Avaya Will Prevail.**

"The moving party's failure to show a likelihood of success on the merits must necessarily result in the denial of a preliminary injunction." *Sidamon-Eristoff*, 669 F.3d at 366 (quotations omitted).  Here, Avaya is not likely to prevail on the merits of its case.  For years, Avaya failed to report sales of product accurately or to pay royalties to SNMPRI at the proper rate.  When SNMPRI discovered this pattern of deceit, it notified Avaya that it was in default. Avaya was responsible to cure its default within 45 days by–paying the royalties due.  Avaya failed to do so.  Rather, it tried to improperly bargain with SNMPRI using a debt that it already owed.  Over 45 days elapsed between Avaya's receipt of the November 1, 2011 notice of default and SNMPRI's February 1, 2012 termination of Avaya's rights under the License Agreement. During that period, rather than make payment on the debt that it acknowledged that it owed, Avaya tried to impose new conditions on the terms of its payment.  Instead of curing its default, Avaya withheld revenue that rightfully belonged to SNPMRI unless SNMPRI agreed to new and more onerous terms.  Finally, after 90 days of Avaya promising to pay, but only coming up with more new conditions, SNMPRI had no other option but to exercise its rights under the terms of the License Agreement and terminate Avaya's license and redistribution rights.  SNMPRI not only had every right to do this, but it had no other reasonable choice but to do so.

Avaya argues that its rights were terminated improperly and asks this Court to overlook its wanton bad faith conduct with regard to the License Agreement and "un-terminate" its license rights–which would trample SNMPRI's intellectual property rights and its rights under the License Agreement.  For the reasons set forth herein, Avaya cannot succeed on the merits of its claim.  SNMPRI did everything in accordance with the License Agreement.  It was Avaya who gave false reports, underpaid royalties and, when its deceit was discovered, tried to bargain with

568576v11

-15-

debt that it was already obligated to pay.  Under this set of facts, Avaya is not likely to succeed

on the merits of its case and, thus, its motion for a preliminary injunction should be denied.[18]

### 3.   Avaya Will Not Suffer Irreparable Harm.

A court cannot grant injunctive relief when the movant does not prove that it is likely to

suffer irreparable harm without an injunction. *See Frank's GMC Truck Center*, 847 F.2d at 102.

Avaya's primary "irreparable harm" argument is that it supposedly will experience damage to its

commercial reputation and market share if its license is terminated.  However, "harm" of the

type complained of by Avaya cannot support a preliminary injunction under the facts of this

case. *See Bennington Foods LLC*, 528 F.3d at 178-79 (3d Cir. 2008) ("[A] plaintiff in a breach of

contract case cannot convert monetary harm into irreparable harm simply by claiming that the

breach of contract has prevented it from performing contracts with others and that this

subsequent failure to perform will harm the plaintiff's reputation."); *Arthrex, Inc. v. dj*

*Orthopedics LLC*, No. CIV.A. 02-67 GMS, 2002 WL 818062, at *4 (D. Del. Apr. 30, 2002).[19]

In any event, Avaya cannot prove that it is likely to sustain any harm that is not self-

inflicted, let alone irreparable harm caused by SNMPRI.  Moreover, Avaya will not be able to

prove any harm at all by "adequate proof, beyond merely conclusory statements or speculation."

---

[18] Avaya's citation to *Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 824 (Tenn. Ct. App. 2009) for the proposition that SNMPRI has acted in bad faith is disingenuous at best.  In *Madden Phillips*, the Court held that the plaintiff failed to comply with its duty to notify the defendant of the breach before terminating the contract. *Id.*  Here, in stark contrast, there is no dispute that SNMPRI notified Avaya of its breach.

[19] Several of the cases cited by Avaya actually support SNMPRI's positions. For instance, in *Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187 (3d Cir. 1990) and *Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc.*, C.A. No. 04-1371-JJF, 2008 WL 5210843 (D. Del. Dec. 12, 2008), the holders of intellectual property rights (like SNMPRI) were awarded injunctions to prevent infringers from causing commercial damage to the intellectual property owner though continued infringement. *2660 Woodley Road Joint Venture v. ITT Sheraton Corp.*, No. Civ.A. 97-450 JJF, 1998 WL 1469541 (D. Del. Feb. 4, 1998) also supports SNMPRI's position. In that case, the party that terminated a contract (like SNMPRI) was granted an injunction when the other party to the contract refused to accept the contract's termination and continued to operate as if it had not been terminated. Another case cited by Avaya, *Howmedica Osteonics v. Zimmer Inc.*, Nos. 11-2342, 11-2343, 2012 WL 477624 (3d Cir. Feb. 15, 2012), is distinguishable because it involved the enforcement of a restrictive covenant, the purpose of which was to prevent a competitor's solicitation of plaintiff's customers, and the breach of said covenant would necessarily involved taking customers and market share from the plaintiff.

568576v11

*Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co.*, 668 F.Supp. 906, 914 (D. Del. 1987); *see also ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) ("[e]stablishing a risk of irreparable harm is not enough" to support an injunction); *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000) ("speculation cannot support an injunction"); *Stryker v. Hi-Temp Specialty Metals, Inc.*, No. 11-6384, 2012 WL 715179 (D.N.J. Mar. 2, 2012).

There is no competent evidence that Avaya will *actually* sustain commercial harm to its reputation or market share. The sole "support" for Avaya's claims is the affidavit of its employee, Michel Cote, who speculates that Avaya's customers "could" take an unfavorable view of Avaya (Cote Decl. ¶ 20), assumes that the resulting "uncertainty" would damage Avaya's reputation (*id.* at ¶ 20), speculates that such damage would be "irrevocabl[e]" and require "substantial corrective remediation" (which alone demonstrates that any harm is, in fact, reparable) (*id.* at ¶¶ 22-23); and hypothesizes that Avaya's competitors might obtain increased market share while Avaya attempts to design around the Software. (*Id.* at ¶ 26.) Seen in the light, Mr. Cote is merely guessing about the risk of any harm that Avaya might – but might not – potentially face. Mr. Cote does not claim that customers have actually taken an unfavorable view of Avaya due to the termination of its license (which occurred several months ago, on February 1, 2012). If the alleged harm to Avaya due to the termination of its rights was realistic, then the effects of the termination would already be felt. In other words, if this threat were real and not just contrived, Avaya should be able to cite to and prove that the termination caused drastic effects for its customers or materially impacted Avaya's commercial reputation and market share. On this point, Avaya has offered nothing more than a thin, speculative theory.

Furthermore, Avaya's entire argument is premised on the false notion that it is in imminent danger of SNMPRI preventing it from shipping products containing the Software.

568576v11

However, Avaya ignores the fact that SNMPRI *has not* moved to enjoin Avaya from distributing its Software. (Wood Decl. ¶ 12.) SNMPRI can seek injunctive relief if it prevails in this case. In that regard, there is no imminent threat to Avaya.

Furthermore, Avaya's customers are not in imminent danger of being prevented from using the products they have already acquired from Avaya.     SNMPRI seeks to recover only damages from Avaya for existing installations and shipments of Avaya products containing the Software properly licensed under the License Agreement.[20] (*See* J. Case Aff. ¶ 23.) To the extent Avaya's customers may wish to obtain new products, they are free to do so from other vendors in the market–including those who, unlike Avaya, have not copied and sold the Software without paying royalties due. (*Id.*) Thus, although Avaya will face the consequences of its actions, the repercussions will not necessarily be felt by its customers.[21]

Finally, there is no evidence to support Avaya's claim that, if it prevails, it will be entitled to recover damages in excess of SNMPRI's ability to pay. Nor has Avaya alleged that any such evidence exists. For example, Avaya does not set forth the data or methodology that it used to calculate any damages, and it has not disclosed those calculations to SNMPRI. Thus, the cases cited on page 15 of Avaya's brief, wherein the record contained evidence that the plaintiff trusts' assets were dissipating beyond their ability to cover liabilities, are distinguishable.

### 4.     The Balance of Hardships Weigh In Favor of SNMPRI.

The irony of Avaya's motion for preliminary injunction is that SNMPRI is the innocent

---

[20] The facts of this case are very different from those in *Liveware Publ'g Inc. v. Best Software Inc.*, 125 Fed. App'x 428 (3d Cir. 2005), cited by Avaya, wherein the licensor had sued and/or threatened to sue the licensee's customers. SNMPRI has not threatened a suit against any of Avaya's customers. Another case cited by Avaya, *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578 (3d Cir. 2002), is distinguishable because it involved allegations that plaintiff's competitor had increased its market share through unfair advertising. *Novartis* does not stand for the proposition that a potential decrease in market share justifies enjoining a licensor from enforcing its contract and intellectual property rights against a non-competitor licensee.

[21] While the SNMPRI software that Avaya obtained through its acquisition of Nortel products is not at issue in this case, it is noteworthy that Avaya has been distributing the SNMPRI Software it obtained from Nortel without a license since at least February 15, 2011 without suffering irreparable harm. (*See* J. Case Aff ¶¶ 25-26.)

party, yet it stands to be greatly harmed by the injunction. If entered, the injunction would effectively (a) re-write the License Agreement so as to eviscerate SNMPRI's rights in the event of Avaya's default, (b) give Avaya the right to commercially exploit the Software without paying royalties, and (c) prevent SNMPRI from enforcing its intellectual property rights. Moreover, although the precise amount in dispute cannot be determined until Avaya reveals the true number of royalty-bearing products it shipped and the dates thereof, this amount–which rightfully belongs to SNMPRI–is far more significant to SNMPRI than to Avaya. Avaya's $5.547 billion in annual revenues (Cote Decl.¶ 7.) is far greater than those of SNMPRI, a relatively small, closely held business with less than $5 million in annual revenues (M. Case Aff. ¶ 5.)

Further, the Court should consider the fact that Avaya's predicament is entirely of its own creation. It should have paid SNMPRI the money it owed, when it was owed–or at least after it had been formally notified that it was in default of the License Agreement.

### 5. The Public Interest Weighs Against an Injunction.

The public interest also weighs in SNMPRI's favor. There is a strong public interest in protecting contract and intellectual property rights such as the rights of entrepreneurial companies like SNMPRI. *See Benitec Austl. Ltd. v. Promega Corp.*, No. Civ.A. 04-889 JJF, 2005 WL 549552, at *7 (D. Del. Mar. 8, 2005) (denying injunction and recognizing "the public interest weighs in favor of enforcing a contract that has been shown to be valid"); *Kyphon, Inc. v. Disc-O-Tech Med. Tech., Ltd.*, No. Civ.A. 04-204 JJF, 2004 WL 2898064, at *6 (D. Del. Dec. 10, 2004) (denying injunction, in part because of public interest in protecting intellectual property rights). The public interest would be offended if a licensee is permitted to breach a license agreement by not reporting sales and not paying royalties without accounting for its breach. This offense would be compounded if that licensee is permitted also to sell products that infringe a copyright holder's rights without recourse. This offense is not diminished simply

568576v11

because some of the licensee's customers are public entities, as Avaya argues. The public is far better served by this Court's enforcement of the License Agreement and protecting SNMPRI's intellectual property rights, especially when there is no imminent danger that Avaya's public or private customers will lose their abilities to use Avaya's products containing the Software.

### 6. Other Factors Weigh Against Granting Avaya's Motion.

Several other factors weigh against granting Avaya's motion. *First*, the Court should consider the instant motion only after it resolves SNMPRI's pending motion to dismiss for lack of personal jurisdiction and to transfer this case to Tennessee (D.I. 7). *Second*, the injunction, if granted, would affect parties (*i.e.*, SNMPR) and rights (SNMPR's and SNMPRI's copyrights) that are *not* part of this case but rather are part of the Tennessee action. The requested injunction could conflict and interfere with proceedings in Tennessee (for example, if the Tennessee court determines that Avaya breached the License Agreement or infringed SNMPR's copyrights). *Third*, the Court should, at a minimum, refrain from deciding the issues until SNMPRI has had the opportunity to take discovery and test Avaya's "evidence."[22] *Fourth*, the particular injunction sought by Avaya is overly broad. It would prevent SNMPRI from "exercising any termination rights" while this litigation is pending. It is not narrowly tailored to only enjoin the termination of Avaya's rights based on the existing royalty payment default. Thus, Avaya would be free to disregard its obligations to SNMPRI, and SNMPRI would be enjoined from terminating the License Agreement based on different future defaults.

## V. CONCLUSION

SNMPRI respectfully requests that the Court deny Avaya's motion for a preliminary injunction and award it such other and further relief as the Court deems just and equitable.

---

[22] For example, SNMPRI reasonably believes that discovery will show that (a) Avaya owes SNMPRI more money than it has offered, and (b) Avaya has not suffered a material amount of commercial harm (if any). (J. Case Aff. ¶ 24.) If this is the case, then it is doubtful that Avaya will eventually be successful on the merits.
568576v11

Dated: May 24, 2012

By: /s/ Karen M. Grivner
  Karen M. Grivner
THORP REED & ARMSTRONG, LLP
Karen M. Grivner (4372)
Gregory W. Hauswirth (5679)
824 Market Street, Suite 710
Wilmington, DE 19801
Tel.: (302) 250-4750; Fax: (302) 421-9439
Email: ghauswirth@thorpreed.com
Email: kgrivner@thorpreed.com

Dennis Hopkins
PERKINS COIE LLP
30 Rockefeller Plaza, 25th Floor
New York, NY 10112
Tel.: (212) 262-6900 / Fax: (212) 977-1649
Email: dhopkins@perkinscoie.com

John L. Wood
EGERTON MCAFEE ARMISTEAD & DAVIS, P.C.
900 S. Gay Street
Knoxville, TN 37902
Tel.: (865) 546-0500/ Fax: (865) 525-5293
Email: jwood@emlaw.com

*Attorneys for Defendant*
*SNMP Research International, Inc.*