## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AVAYA INC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| | § | |
| v. | § | C.A. No. 1:12-cv-00191-RGA-SRF |
| | § | |
| SNMP RESEARCH INTERNATIONAL, | § | |
| INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |

## UNREPORTED OPINIONS SUPPORTING DEFENDANT'S OBJECTION TO REPORT AND RECOMMENDATION

Of Counsel:

Richard S. Busch, Esquire
**KING & BALLOW**
315 Union Street
Suite 1100
Nashville, Tennessee 37201
Telephone: (615) 726-5422
Email: rbusch@kingballow.com

John L. Wood, Esquire
**EGERTON MCAFEE ARMISTEAD &**
**DAVIS, P.C.**
900 S. Gay Street
Knoxville, TN 37902
865.546.0500 (Phone)
JWood@emlaw.com

**CLARK HILL THORP REED**
Karen M. Grivner (No. 4372)
824 Market Street, Suite 710
Wilmington, DE 19801
Telephone: (302) 250-4750
Facsimile: (302) 421-9439
Email: kgrivner@clarkhillthorpreed.com

*Attorneys for Defendant SNMP Research*
*International, Inc.*

Dated: June 25, 2013

2005 WL 3031638
Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee.

Dot Bush GOOT et al.
v.
METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY.

No. M2003-02013-COA-R3-CV. | Oct. 4, 2004
Session. | Nov. 9, 2005.

Appeal from the Circuit Court for Davidson County, No.
01C-3841; Thomas Brothers, Judge.

**Attorneys and Law Firms**

Dan R Alexander, Nashville, Tennessee, for the
appellants, Dot Bush Goot, Norma Taylor, Bobby Duke,
Joe Reese, and Faye Jackson.

Karl F. Dean, Michael B. Bligh, and John L. Kennedy, for
the appellee, Metropolitan Government of Nashville and
Davidson County.

WILLIAM C. KOCH, JR., P.J., M.S., delivered the
opinion of the court, in which WILLIAM B. CAIN, J.,
joined. PATRICIA J. COTTRELL, J ., not participating.

**Opinion**

## OPINION

WILLIAM C. KOCH, JR., P.J., M.S.

**\*1** This appeal involves a dispute between the surviving
spouses of five disabled city employees and the
Metropolitan Government of Nashville and Davidson
County over the amount of life insurance benefits payable
after the employees died. The surviving spouses filed
three separate lawsuits asserting that the city had breached
their spouses' employment contracts as well as its
fiduciary duty and had committed fraud by concealing
information and by knowingly providing false
information regarding a waiver of premium benefit that
would have greatly increased their death benefits. These
suits were consolidated in the Circuit Court for Davidson

County. The trial court granted a summary judgment
dismissing all the surviving spouses' intentional tort
claims because they were barred by the Governmental
Tort Liability Act. The remaining breach of contract
claims of three of the surviving spouses were tried to a
jury, and the trial court directed a verdict for the city at
the close of the plaintiffs' proof. Thereafter, the trial court
granted a summary judgment dismissing the remaining
claims of the other two surviving spouses. All the
surviving spouses have appealed. We affirm the summary
judgment orders dismissing the surviving spouses'
intentional tort claims and the breach of contract claim of
one surviving spouse. We reverse the directed verdict
with regard to three of the remaining surviving spouses'
breach of contract claims, as well as the summary
judgment dismissing the other surviving spouse's breach
of contract claim.

I.

## METROPOLITAN GOVERNMENT'S GROUP LIFE
## INSURANCE BENEFIT

The Metropolitan Government of Nashville and Davidson
County, like most large public and private employers,
provides group insurance benefits to its employees. Ever
since 1965, it has provided life insurance coverage to
active employees and former employees who are
receiving disability or retirement benefits.[1] The New York
Life Insurance Company issued the first group term life
insurance policy in 1965, and Aetna Life Insurance
Company replaced New York Life Insurance Company in
1999. The Metropolitan Government is responsible for
paying the premiums for this policy, and the insurance
companies are responsible for determining eligibility and
paying the claims.

At all times relevant to this case, the group term life
insurance policy provided active city employees with life
insurance coverage equal to twice their annual salary to a
maximum of $50,000. Former employees receiving a
disability or service pension were entitled to $7,500 in
coverage. However, the policy also contained a waiver of
premium provision that entitled employees who became
disabled before their sixtieth birthday to maintain their
life insurance coverage at the same level they had as
active employees without continuing to pay the premiums
that had been paid by the Metropolitan Government while
they were active employees.[2] To be eligible for this

benefit, the disabled former employee was required to be "disabled" as defined in the insurance policy, and the employee seeking the waiver of premium benefit was required to apply to the insurance company for this benefit within two years after being found eligible for a disability pension.

**\*2** The life insurance benefits payable to the spouses of eligible disabled employees differed significantly depending on whether the employee established his or her right to the waiver of premium benefit. The spouses of disabled employees who had not qualified for the benefit received $7,500 upon the death of their spouse. However, the spouses of disabled employees who qualified for the benefit and who had earned $25,000 or more when they were active employees received $50,000 upon the death of their spouse.

## II.

## THE CLAIMS OF THE SURVIVING SPOUSES

The three lawsuits giving rise to this appeal involve the surviving spouses of five employees of the Metropolitan Government who became disabled and took disability retirement between 1985 and 1996. Roy Bush, a budget director, began drawing disability benefits in January 1985 following his second open heart surgery. Following his death on April 14, 1992, his widow, Dot Bush Goot, received life insurance benefits in the amount of $7,548.75. Blant Duke, a civil warrant processor in the Davidson County Sheriff's Department, qualified for disability benefits in February 1985. When he died, his widow, Bobbie Jane Duke, received $7,544.68. Gene Jackson, an employee of the Department of Public Works, was a member of the old Davidson County pension plan because he had declined to become a member of the Metropolitan Employee Benefit System. He qualified for a disability pension in January 1987 because of heart problems. After he died on June 18, 1998, his widow, Wanda Faye Jackson, received $7,543.88. Clyde Taylor, a sergeant with the Metropolitan Police Department, qualified for a disability pension in 1992. Following his death on April 7, 2000, his widow, Norma H. Taylor, received $7,500. Finally, Marilyn Reese, an employee at General Hospital, qualified for disability in February 1996 after injuring her back. After she died on April 9, 2001, her surviving husband, Joe Lloyd Reese, received $7,500.

The surviving spouses of these five employees later

discovered that they would have received a much larger death benefit had their deceased spouse qualified for the waiver of premium benefit within two years after being found eligible for a disability pension. Two of the surviving spouses, Ms. Goot and Ms. Jackson, attribute their former husbands' failure to qualify for the benefit to their ignorance of the benefit because employees of the Metropolitan Government had not provided their husbands with timely information about this benefit.

Two other spouses, Ms. Duke and Ms. Taylor, assert that their former husbands did not qualify for the waiver of premium benefit because employees of the Metropolitan Government provided them with false information regarding their eligibility. Ms. Duke asserts that her husband inquired about the waiver of premium benefit and was told that he was not eligible for the benefit because he was in the wrong department. Ms. Taylor asserts that her husband applied for the benefit after he had been disabled for one year but that he was told that his application was too late.

**\*3** The remaining spouse, Mr. Reese, concedes that his wife received two documents explaining the waiver of premium benefit when she qualified for a disability retirement in 1996 and that she did not apply for the benefit within two years after she became eligible for disability payments. He also concedes that her July 1999 application for the benefit was turned down because it was too late. However, he asserts that the Metropolitan Government should have given his wife another chance in 2000 to apply for the benefit after Aetna Life Insurance Company suggested to the Metropolitan Government that it offer a one-time grace period to permit disabled employees who had not requested the waiver of premium benefit to submit their applications.

On July 18, 2001, Mmes. Goot, Taylor, and Duke filed a complaint in the Chancery Court for Davidson County seeking to recover the death benefit they would have received had their husbands qualified for the waiver of premium benefit. They alleged that they were third-party beneficiaries of their husbands' group life insurance contracts and that the Metropolitan Government had breached its contractual and fiduciary duties to their husbands "by concealing and failing to inform Plaintiffs of contract provisions that inure to their benefit ... and by intentionally lying to the Plaintiffs to the detriment of the Plaintiffs and to the benefit of the insurance companies...."

Mr. Reece, represented by the same attorney who was representing Mmes. Goot, Taylor, and Duke, filed his complaint in the Chancery Court for Davidson County on

July, 30, 2001 seeking the death benefit he would have received had his wife qualified for the waiver of premium benefit. He too alleged that he was a third-party beneficiary of his wife's group life insurance contract and that the Metropolitan Government had breached its contractual and fiduciary duties by failing to notify either his wife or him of Aetna Life Insurance Company's July 20, 2000 proposal for the grace period. Like Mmes. Goot, Taylor, and Duke, Mr. Reese accused the employees of the Metropolitan Government of "concealing and failing to inform" and of "intentionally lying."

On December 7, 2001, the Chancery Court for Davidson County transferred the complaint filed by Mmes. Goot, Taylor, and Duke to the Circuit Court for Davidson County.[3] On December 21, 2001, Ms. Jackson, represented by the same attorney who was representing the other four surviving spouses, filed her complaint in the Circuit Court for Davidson County. She asserted that the Metropolitan Government had breached its fiduciary duties and its employment contract with her husband by "concealing and failing to inform" her of the "waiver of premium option" that would have provided her with a larger death benefit and by "intentionally lying" to her and her husband.[4]

On May 3, 2002, all three complaints were consolidated in the Circuit Court for Davidson County for "pre-trial and discovery purposes only." At this point, the Metropolitan Government had filed an answer to Ms. Jackson's amended complaint but had not yet filed answers to either Mr. Reese's complaint or the complaint filed on behalf of Mmes. Goot, Taylor, and Duke.[5] On October 15, 2002, the Metropolitan Government filed identical motions for summary judgment in all three cases. While none of these motions complied with Tenn. R. Civ. P. 7.02(1),[6] we glean from the record that the motions asserted that the surviving spouses' intentional tort claims based on the alleged misrepresentations by employees of the Metropolitan Government were barred by Tenn.Code Ann. § 29-20-205(6) (2000). The surviving spouses responded by insisting that their claims sounded in contract rather than in tort. On January 15, 2003, following a hearing on December 13, 2002, the trial court entered an order granting partial summary judgments in all three cases because "the ... [plaintiffs'] tort claims arise out of alleged misrepresentations by employees of the Defendant and are therefore barred by the Governmental Tort Liability Act." However, the court permitted the cases to continue because "the facts put forth by the ... [surviving spouses] arguably state a claim for breach of contract and will require a trial."

**\*4** On June 17, 2003, the trial court empaneled a jury to try the remaining breach of contract claims of Mmes. Goot, Taylor, and Duke. The Metropolitan Government moved for a directed verdict on numerous grounds at the close of the plaintiffs' case-in-chief. It was at this point that the parties and the court discovered that the Metropolitan Government had never filed an answer. The trial court decided to direct a verdict for the Metropolitan Government after concluding that Mmes. Goot, Taylor, and Duke had "failed to prove an essential element of their claim." The court concluded that the plaintiffs had "failed to prove the terms of the insurance contract under which they claim they would have benefited [sic] had they been informed of its terms" and that without this proof the jury would be unable to determine whether their spouses "would have qualified for the waiver of premium benefit" or "to determine Plaintiffs' damages." The trial court entered an order granting the directed verdict on July 15, 2003.

On August 29, 2003, the Metropolitan Government filed new motions for summary judgment seeking dismissal of the remaining claims of Mr. Reese and Ms. Jackson. Following a hearing on October 10, 2003, the trial court entered separate orders on October 23, 2003 granting the motions and dismissing all remaining claims. The court concluded that Ms. Jackson's breach of contract claim was "barred by the applicable statute of limitations." With regard to Mr. Reese's remaining claim, the court determined that his deceased wife had been properly notified of the waiver of premium benefit and that "the July 20, 2000 letter from Aetna U.S. Healthcare[7] did not merge with Mrs. Reese's contract of employment so as to require the Defendant to notify her of its contents."

The five surviving spouses have appealed. All five take issue with the summary judgment dismissing their intentional tort claims. Mmes. Goot, Taylor, and Duke challenge the directed verdict dismissing their contract claims. Finally, Mr. Reese and Ms. Jackson take issue with the summary judgments dismissing their contract claims.

## III.

## THE SURVIVING SPOUSES' INTENTIONAL TORT CLAIMS

Despite their insistence in the trial court that their claims sounded in contract rather than tort, all five surviving spouses take issue with the trial court's decision to grant

the summary judgment dismissing their intentional tort claims on the ground that they were barred by Tenn.Code Ann. § 29-20-205(6). They assert that the trial court erred because their complaints contain claims based on intentional torts other than misrepresentation and that these claims are permitted under Tenn.Code Ann. § 29-20-310(c) (Supp.2004). We have concluded that the trial court properly dismissed these intentional tort claims.

The doctrine of sovereign immunity, embedded in Tenn. Const. art. I, § 17, provides that suits for money damages may not be brought against the State of Tennessee or other governmental entities without their consent. *Doyle v. Frost,* 49 S.W.3d 853, 857 (Tenn .2001); *Hawks v. City of Westmoreland,* 960 S.W.2d 10, 14 (Tenn.1997). When the Tennessee General Assembly enacted the Governmental Tort Liability Act in 1973,[8] it consented to suits for money damages being filed against counties, municipalities, and other local government entities. The Governmental Tort Liability Act must be construed strictly because it is in derogation of the common law. *Limbaugh v. Coffee Med. Ctr.,* 59 S.W.3d 73, 79 (Tenn.2001). Where immunity from suit has been waived, the government entity is the proper defendant, not the government employee whose conduct caused the injury. Tenn.Code Ann. § 29-20-310(b) (Supp.2004); *Sallee v. Barrett,* 171 S.W.3d 822, 826 (Tenn.2005).

**\*5** Tenn.Code Ann. § 29-20-205 expressly removes immunity from suit "for injury proximately caused by a negligent act or omission of any employee within the scope of his [or her] employment." However, the statute contains exceptions to waiver. While it had been believed for decades that the Governmental Tort Liability Act did not authorize suits for damages caused by a local government employee's intentional tort,[9] the Tennessee Supreme Court has now held that the Act does not embody a blanket prohibition against suits seeking damages for all intentional torts. Rather, the Court has limited the immunity to the intentional torts enumerated in Tenn.Code Ann. § 29-20-205. *Limbaugh v. Coffee Med. Ctr.,* 59 S.W.3d at 84.[10]

The Governmental Tort Liability Act explicitly provides that local governments retain immunity for injuries caused by their employees "deceit," Tenn.Code Ann. § 29-20-205(2), and for injuries caused by "misrepresentation by an employee whether or not such is negligent or intentional," Tenn.Code Ann. § 29-20-205(6). The issue we must decide is whether the tort claims of the five surviving spouses fall within the scope of these two provisions. We are guided in our analysis of this question by the customary rules of statutory construction, as well as our understanding of the

state of the law when the Governmental Tort Liability Act was enacted. *Sallee v. Barrett,* 171 S.W.3d at 826-29; *Limbaugh v. Coffee Med. Ctr.,* 59 S.W.3d at 83.

Substantial overlapping exists in modern tort law with regard to the concepts of deceit and misrepresentation. Misrepresentation is the keystone in the architecture of the tort law of fraud and deceit. 9 STUART M. SPEISER, THE AMERICAN LAW OF TORTS § 32:11, at 228 (1992); *see also Robinson v. Omer,* 952 S.W.2d 423, 426-27 (Tenn.1997) (recognizing three separate torts based on misrepresentation, including fraud or deceit); *Holt v. Am. Progressive Life Ins. Co.,* 731 S.W.2d 923, 927 (Tenn.Ct.App.1987). For the most part, the common-law tort of deceit is limited to cases where there was an intent to mislead. 2 FOWLER V. HARPER, THE LAW OF TORTS § 7.1, at 381 (2d ed.1986); PROSSER AND KEETON ON THE LAW OF TORTS § 107, at 740. The concept of misrepresentation which can be traced to the common-law action of deceit, RESTATEMENT (SECOND) OF TORTS Chapter 22 Scope Note, at 54 (1977); *First Nat'l Bank v. Brooks Farms,* 821 S.W.2d 925, 927 (Tenn.1991), is a broader concept than deceit. PROSSER AND KEETON ON THE LAW OF TORTS § 105, at 727.

Every one of the tort claims included in the five surviving spouses' complaints contain allegations involving "concealing and failing to inform," "intentionally lying," and "fraud, fraudulent concealment, deceit and fraudulent misrepresentation by concealing information ... and by providing false and incorrect information known by the [d]efendants to be false." Each of these claims easily fits within the scope of the Governmental Tort Liability Act's exclusion of claims based on "deceit" and "misrepresentation." Therefore, the trial court properly granted the Metropolitan Government's motion to dismiss the surviving spouses' tort claims.

## IV.

## MS. JACKSON'S BREACH OF CONTRACT CLAIM

**\*6** Ms. Jackson takes issue with the trial court's decision to grant the Metropolitan Government's summary judgment motion based on the statute of limitations. She insists that the discovery rule should apply to her breach of contract claim. We agree.

## A.

Ms. Jackson's breach of contract claim, like the claims of the other surviving spouses, arises from the employment relationship between the Metropolitan Government and her deceased spouse. Her complaint embodies essentially two theories. First, she asserts that the Metropolitan Government breached its specific obligation to explain the benefit system and infringed upon her husband's rights by failing to inform him of the existence of the waiver of premium benefit. Second, she asserts that the Metropolitan Government's failure to inform her husband of this benefit also violated its obligation of good faith and fair dealing.

The relationship of employer and employee arises out of contract. *Vargo v. Lincoln Brass Works, Inc.,* 115 S.W.3d 487, 491 (Tenn.Ct .App.2003). It is based on the mutual assent of the parties, and it is the product of an agreement or series of agreements between the employer and employee regarding the scope and nature of the work to be performed, the duration, terms, and conditions of employment, and the compensation for performing the work. *Hamby v. Genesco, Inc.,* 627 S.W.2d 373, 375 (Tenn.Ct.App.1981). An employment agreement may be written, oral, or a combination of the two, and the terms of the agreement may either be specifically bargained for or may be supplied by applicable legal requirements.

## 1.

### The Metropolitan Government's Contractual Obligations With Regard To Providing Its Employees with Life Insurance Coverage Containing a Waiver of Premium Provision

The Metropolitan Government is required to provide its employees with a "program of benefits ... to provide for specific kinds of needs upon death, upon hospitalization and sickness and upon retirement because of disability or old age."[11] Included among these benefits are "benefits payable upon the death of the employee which are not inconsistent with furnishing group life insurance plans in general use by businesses and industries in Davidson County...."[12] Accordingly, employees who are members of the Metropolitan Employee Benefit System are entitled to be "covered for life insurance benefits during all times that he [or she] is an eligible employee...."[13] In order to provide this benefit, the Metropolitan Employee Benefit Board is required to enter into a group contract with a life insurance company to "underwrite" the required insurance benefits.[14] This contract must include a "[w]aiver of premium benefits for disability occurring prior to age sixty...."[15]

The Metropolitan Government's obligation to its employees does not end with simply making arrangements to provide group benefits to its employees. Because of the complexity of group benefits, the Metropolitan Employee Benefit Board must also take steps to make sure that the employees are aware of and understand what their benefits are. Accordingly, the Metropolitan Employee Benefit Board must "[d]irect the preparation of and approve a booklet explaining the metropolitan employee benefit system in full detail, and make available in the pension office to metropolitan employees full information concerning a metropolitan employee's status and his [or her] rights concerning the system...."[16]

## 2.

### The Metropolitan Government's Duty of Good Faith and Fair Dealing

**\*7** Under Tennessee Law, every contract carries with it an implied covenant of good faith and fair dealing. *Wallace v. Nat'l Bank of Commerce,* 938 S.W.2d 684, 686 (Tenn.1996); *Elliott v. Elliott,* 149 S.W.3d 77, 84-85 (Tenn.Ct.App.2004). As a result of this covenant, each contracting party promises to perform its part of the contract in good faith and, in return, expects the other party to do the same.

The purpose of the implied-in-law covenant is two-fold. First, it honors the contracting parties' reasonable expectations. *Bayou Land Co. v. Talley,* 924 P.2d 136, 154 (Colo.1996); *Cox v. CSX Intermodal, Inc.,* 732 So.2d 1092, 1097 (Fla.Dist.Ct.App.1999); *Cenac v. Murry,* 609 So.2d 1257, 1272 (Miss.1992); *Sons of Thunder, Inc. v. Borden, Inc.,* 690 A.2d 575, 586 (N.J.1997). Second, it protects the rights of the parties to receive the benefits of the agreement they entered into. *Winfree v. Educators Credit Union,* 900 S.W.2d 285, 289 (Tenn.Ct.App.1995); *see also Wagenseller v. Scottsdale Mem'l Hosp.,* 710 P.2d 1025, 1040 (Ariz.1985); *Guz v. Bechtel Nat'l, Inc.,* 8 P.3d 1089, 1110 (Cal.2000); *Habetz v. Condon,* 618 A.2d 501, 505 (Conn.1992). The implied obligation of good faith

and fair dealing does not, however, create new contractual rights or obligations,[17] nor can it be used to circumvent or alter the specific terms of the parties' agreement.[18]

Despite the seemingly broad application of the implied duty of good faith and fair dealing to all contracts, this court is not of one mind regarding its application to employment contracts. The Eastern Section has held that the duty of good faith and fair dealing is part of every employment contract. *Hooks v. Gibson,* 842 S.W.2d 625, 628 (Tenn.Ct.App.1992); *Williams v. Maremont Corp.,* 776 S.W.2d 78, 80-81 (Tenn.Ct.App.1988). However, the Western Section has held that there is no implied duty of good faith and fair dealing in employee-at-will contracts. *McGee v. Best,* 106 S.W.3d 48, 67 (Tenn.Ct.App.2002); *Randolph v. Dominion Bank,* 826 S.W.2d 477, 479 (Tenn.Ct.App.1991). The Middle Section has held that the employment agreements include the implied duty of good faith and fair dealing, *Dunn v. Matrix Exhibits, Inc.,* No. M2003-02725-COA-R3-CV, 2005 WL 2604048, at *3 (Tenn.Ct.App. Oct. 13, 2005), but has also held that employers do not breach their implied duty of good faith and fair dealing when they fire an at-will employee. *Whittaker v. Care-More, Inc.,* 621 S.W.2d 395, 396 (Tenn.Ct.App.1981).

We have determined that the Western Section went too far when it completely excised the implied duty of good faith and fair dealing from at-will employment contracts. The cases before the Western Section involved at-will employees who believed that they had been fired unfairly. They asserted that their termination was a breach of the employment agreement because it violated their employer's implied duty of good faith and fair dealing. The Western Section resolved the claim in the employer's favor by holding that employment-at-will contracts do not contain an implied duty of good faith and fair dealing.

*8 Employees-at-will have no contract right or expectation of continued, indefinite employment because they can be terminated at any time for any reason.[19] However, they may have other contract rights and expectations, such as the right and expectation to be paid the agreed-upon wage and the right and expectation of having work hours consistent with applicable federal and state law. *Williams v. Maremont Corp.,* 776 S.W.2d at 81. Because the implied obligation of good faith and fair dealing does not create new rights or modify existing contract rights, it would have been more appropriate for the Western Section to hold that the implied duty of good faith and fair dealing cannot modify the employment-at-will doctrine and, therefore, that an employer does not breach its implied duty of good faith and fair dealing when it discharges an at-will employee

for any reason.

Accordingly, we find that the Metropolitan Government's employment agreement with its employees includes an implied obligation of good faith and fair dealing on the part of both the Metropolitan Government and its employees. This obligation required both parties to act in good faith or "to act in word and deed, in a responsible manner." *Williams v. Maremont Corp.,* 776 S.W.2d at 81 (quoting HENRY R. GIBSON, GIBSON'S SUITS IN CHANCERY § 34, at 34 (William H. Inman ed., 6th ed.1982)).

### 3.

### The Metropolitan Government's Performance of Its Contractual Obligations Regarding the Waiver of Premium Benefit

When employers procure group insurance policies to cover their employees, they are acting for themselves and as agents for their employees. *Boseman v. Conn. Gen. Life Ins. Co.,* 301 U.S. 196, 204-05, 57 S.Ct. 686, 690 (1937); *Hale v. Am. Home Assurance Co.,* 224 Tenn. 650, 656, 461 S.W.2d 384, 386 (1970); *Bates v. Jim Rule Chevrolet, Inc.,* No. 16, 1990 WL 51295, at *6 (Tenn.Ct.App. Apr. 26, 1990) (No Tenn. R.App. P. 11 application filed); *Nidiffer v. Clinchfield R.R. Co.,* 600 S.W.2d 242, 246 (Tenn.Ct.App.1980). Accordingly, they have a duty to act in good faith and with due diligence in obtaining insurance for their employees. *Estate of Saffles v. Reliance Universal, Inc.,* 701 S .W.2d 821, 823-24 (Tenn.Ct.App.1985); *Nidiffer v. Clinchfield R.R. Co.,* 600 S.W.2d at 246. The surviving spouses are not taking issue in this case with the manner in which the Metropolitan Government obtained the group life insurance policies first from the New York Life Insurance Company and later from Aetna Life Insurance Company. Accordingly, for the purpose of this appeal, we presume that the Metropolitan Government breached no obligation to its employees when it obtained the group life insurance policy.

However, an employer's duty to inform its employees of their rights and benefits under a group insurance policy is independent from its obligation to procure the policy. The source of this duty may be statutory[20] or contractual or may even be imposed by the common law. *Burnette v. Purolator Courier Corp.,* No. 1284, 1990 WL 801, at *2 (Tenn.Ct.App. Jan. 9, 1990), *perm. app. denied* (Tenn.

Mar. 26, 1990). In this case, Metro. Code § 3.08.040(A)(3) required the Metropolitan Government to explain the employee benefit system "in full detail" and to make available in the retirement office "full information" concerning the employees' "status and ... rights concerning the system...." Accordingly, the Metropolitan Government, as part of its employment agreement with its employees, had an obligation to fully inform its employees of their rights and status with regard to the waiver of premium benefit.

**\*9** The surviving spouses have presented evidence that calls into question whether the Metropolitan Government has acted reasonably in discharging its contractual obligation to inform its employees of the waiver of premium benefit. Even though the group life insurance policy has been in place since 1965, there is evidence that prior to 1992, the Metropolitan Government either failed to inform disabled employees of the existence of this benefit[21] or misinformed the employees who asked about it.[22] While there is some evidence that the Metropolitan Government was informing disability retirees of the existence of this benefit in 1996, general notice of this benefit was not given until the publication of *ME News*[23] in July 2001. This evidence is sufficient to create an issue for the jury regarding whether the Metropolitan Government has breached its duty to notify its employees of their benefits as well as its duty of good faith and fair dealing.

### B.

The Metropolitan Government asserts that Ms. Jackson's breach of contract claim is time-barred because she failed to file her complaint withing six years after the purported breach of the contract in 1987 when it failed to inform her spouse of the existence of the waiver of premium benefit. Ms. Jackson concedes that the six-year statute of limitations in Tenn.Code Ann. § 28-3-109(a)(3) applies. However, she insists that the discovery rule should apply and that if it does, her complaint is timely because she filed it within six years after discovering that her husband would have been entitled to the waiver of premium benefit had the Metropolitan Government explained it to him when he took disability retirement in 1987. The trial court concluded that Ms. Jackson's complaint was time-barred, and thus we must determine whether the discovery rule may be invoked with regard to Ms. Jackson's breach of contract claim.

### 1.

The discovery rule is a limited exception to the statute of limitations. *Pero's Steak & Spaghetti House v. Lee,* 90 S.W.3d 614, 621 (Tenn.2002) (characterizing the discovery rule as an "equitable exception" to the statute of limitations). It tolls the running of the statute of limitations until the plaintiff knows or, in the exercise of reasonable care and diligence, should know that the plaintiff has a legal cause of action against the defendant. *Terry v. Niblack,* 979 S.W.2d 583, 586 (Tenn.1998); *Hunter v. Brown,* 955 S.W.2d 49, 51 (Tenn.1997).

The rationale underlying the discovery rule is that injured parties should not be placed in the anomalous situation of being required to file suit before they know they have been injured. *McCroskey v. Bryant Air Conditioning Co.,* 524 S.W.2d 487, 490 (Tenn.1975); *Teeters v. Currey,* 518 S.W.2d 512, 515 (Tenn.1974). The rule alleviates the intolerable result of barring a cause of action by holding that it "accrued" before the plaintiff discovered the injury or the wrong. *Foster v. Harris,* 633 S.W.2d 304, 305 (Tenn.1982). However, the rule applies only in cases where the plaintiff did not discover and reasonably could not have been expected to discover the existence of a right of action, *Hunter v. Brown,* 955 S.W.2d at 51, and it tolls the running of the statute of limitations only as long as the plaintiff has no knowledge at all that a wrong has occurred and, as a reasonable person, would not have been put on inquiry. *Potts v. Celotex Corp.,* 796 S.W.2d 678, 680 (Tenn.1990).

**\*10** The discovery rule was first invoked by the Tennessee Supreme Court over thirty years ago in a medical malpractice case. *Teeters v. Currey,* 518 S.W.2d at 515. It has since been applied to other tort actions, *McCroskey v. Bryant Air Conditioning Co.,* 524 S.W.2d at 491, including legal and dental malpractice claims. *Carvell v. Bottoms,* 900 S.W.2d 23, 28 (Tenn .1995) (legal malpractice); *Foster v. Harris,* 633 S.W.2d at 305 (dental malpractice). However, the Tennessee Supreme Court has declined to apply the discovery rule in cases involving breach of warranty claims governed by Tenn.Code Ann. § 47-2-725 (2001),[24] defamation actions,[25] and claims for conversion of a negotiable instrument absent fraudulent concealment.[26]

The Tennessee Supreme Court has yet to address whether the discovery rule may apply to breach of contract claims and, if so, the circumstances warranting its application. However, this court appears to have endorsed the application of the discovery rule in a breach of contract case involving a lease of real property. *McFarlin v. City of Murfreesboro,* No. 86-124-II, 1987 WL 17728, at \*3 (Tenn.Ct.App. Sept. 30, 1987) (No Tenn. R.App. P. 11

application filed). The property owner leased his property to a city for a landfill. The contract required the city to cover the top of the landfill with soil in accordance with applicable environmental regulations. The city abandoned the landfill, but the owner did not discover for many years that the city had failed to cover the landfill with the amount of soil required by the environmental regulations. The property owner sued the city for breach of contract within one year after discovering the condition but more than six years after the city had abandoned the property. The trial court dismissed the property owner's claim because it was not filed within the six-year statute of limitations in Tenn.Code Ann. § 28-3-109(a)(1) (2000).

This court reversed the order granting the city's motion to dismiss. We framed the issue as follows: "whether late discovery of a contract violation resulting in injury to property may effectively delay the running of the statute." *McFarlin v. City of Murfreesboro,* 1987 WL 17728, at *3. In the process of overruling the motion to dismiss, "despite the apparent running of the statute of limitations," this court noted:

> The resolution of the issue under discussion is not without doubt. It is insisted that no Tennessee authority applies the discovery rule to actions for breach of contract.... It is arguable that a party to a contract knows (or should know) his [or her] rights under the contract and should be alert to discover any non-feasance, misfeasance or malfeasance under the contract. While this would ordinarily be the case, in the present situation the opportunity to observe and discover violations was less obvious, for the contract was a lease in which the owner surrendered possession to the lessee for the term of the lease. Moreover, the very nature of the lease contract was such as to enable the lessee to conceal the breach of contract. That is, the contract required the lessee to cover (conceal) the rubbish with a sufficient layer of earth. Once the rubbish was covered, the depth of coverage would not be observable until the passage of time and the operation of the elements caused the deficiency to be visible.

*11 *McFarlin v. City of Murfreesboro,* 1987 WL 17728, at *4.

We now directly address the application of the discovery rule to breach of contract actions using the criteria fashioned by the Tennessee Supreme Court to determine whether the discovery rule may be invoked with regard to a particular cause of action. *Pero's Steak & Spaghetti House v. Lee,* 90 S.W.3d at 620; *Quality Auto Parts Co. v. Bluff City Buick Co.,* 876 S.W.2d at 820. We must first consider the language of the specific statute of limitations applicable to the claim and then we must balance the policies supporting the discovery rule[27] against the policies supporting the strict application of the statute of limitations.[28]

### 2.

The six-year statute of limitations in Tenn.Code Ann. § 28-3-109(a)(3) applies to this case. That statute simply provides that contractual causes of action not otherwise expressly provided for "shall be commenced within six(6) years after the cause of action accrued...." This language is quite similar to the other statutes of limitations to which the Tennessee Supreme Court has applied the discovery rule, and the statute contains no other language that would otherwise be inconsistent with the invocation of the discovery rule in proper circumstances.

As a general matter, there will be little need for the discovery rule in most breach of contract cases. A buyer is immediately aware of a breach upon the delivery of nonconforming goods, and a seller knows of the breach when payment is delinquent.[29] However, it is not difficult to envision circumstances in which a party to a contract would not be aware that the other party has breached the contract. In those circumstances, just as in tort claims involving personal injuries, it would be unjust to hold that a plaintiff's claim for breach of contract accrues before the plaintiff knew or should have known that the contract had been breached.

Many courts now apply the discovery rule to breach of contract claims and hold that a cause of action for breach of contract begins to run when a party either discovers the breach or could have or should have discovered the breach through the exercise of reasonable judgment. 31 SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 79:14, at 304 (Richard A. Lord ed., 4th ed.2004) [hereinafter WILLISTON ON CONTRACTS].[30] These courts have invoked the discovery rule in cases where (1) the breach of contract

was difficult for the plaintiff to detect, (2) the defendant was in a far superior position to comprehend the breach and the resulting damage, or (3) the defendant had reason to believe that the plaintiff remained ignorant that it had been wronged. *El Pollo Loco, Inc. v. Hashim,* 316 F.3d 1032, 1039 (9th Cir.2003). Stated another way, the discovery rule applies in cases where the breach of contract is inherently undiscoverable.[31] *April Enters., Inc. v. KTTV,* 195 Cal.Rptr. at 437; *J.M. Krupar Constr. Co. v. Rosenberg,* 95 S.W.3d 322, 329 (Tex.App.2002).

**\*12** There are, however, at least two circumstances in which the invocation of the discovery rule would be improper, even when the breach of contract is inherently undiscoverable. First, as the Tennessee Supreme Court has pointed out, the discovery rule cannot be invoked when it is inconsistent with the terms of the applicable statute of limitations. In these circumstances, the Tennessee General Assembly has already weighed the competing policies involving the accrual of the cause of action and the tolling of the statute. Second, the discovery rule cannot supercede a contractually agreed upon limitations period as along as the agreed upon period affords a reasonable time within which to file suit. *See New Welton Homes v. Eckman,* 830 N.E.2d 32, 35 (Ind.2005); 3 ERIC MILLS HOLMES, CORBIN ON CONTRACTS § 9.9, at 278 (Joseph M. Perillo ed., rev. ed.1996). In these circumstances, the parties themselves have weighed the competing considerations, and their bargain should be enforced as long as it is consistent with public policy.

### 3.

According to Ms. Jackson, neither she nor her husband were aware of the waiver of premium benefit in 1987 when her husband qualified for disability retirement. Accordingly, the Jacksons were not aware that the Metropolitan Government had breached its contractual obligation to inform Mr. Jackson of the existence of this benefit. It would be unreasonable and unrealistic to impute either to Mr. Jackson or Ms. Jackson independent knowledge of the details of the group life insurance policy that the Metropolitan Government had purchased or of the provision in the Metropolitan Code requiring that a waiver of premium benefit be included in the group life insurance contract.[32]

Thus, for the purposes of the discovery rule, it would have been difficult for the Jacksons to be aware of or discover that the Metropolitan Government had breached its contract in 1987 by failing to inform them of the existence

of the waiver of premium benefit. The Metropolitan Government was in a far superior position when compared to the Jacksons, and because of its failure to notify them of the existence of this benefit, the Metropolitan Government had reason to believe that the Jacksons were unaware of both the existence of the benefit and the Metropolitan Government's breach.

Ms. Jackson first learned of the existence of the waiver of premium benefit in July 1998 when she applied for benefits following her husband's death. She was told at that time that she was ineligible for this benefit because Mr. Jackson had failed to apply for and qualify for the benefit within two years following his disability retirement in 1987. Ms. Jackson filed her lawsuit against the Metropolitan Government in December 2001, within six years following her discovery of the existence of the benefit and the Metropolitan Government's breach of contract. We have determined that Ms. Jackson may invoke the discovery rule and, therefore, that her complaint was timely filed. Accordingly, we reverse the summary judgment dismissing her breach of contract claim on the ground that it was not timely filed.

### V.

### MR. REESE'S BREACH OF CONTRACT CLAIM

**\*13** Mr. Reese's claim stands on a factual footing far different from the claims of the other surviving spouses because his wife is the only employee who received timely notice of the waiver of premium benefit. Ms. Reese took disability retirement in February 1996, and in April 1996 she received two documents from the Metropolitan Government informing her of the waiver of premium benefit and the steps to be taken to qualify for it. Despite this information, Ms. Reese did not apply for the benefit until July 1999. Her application was rejected because it had not been filed within two years after she qualified for disability retirement.

Up to this point, the facts clearly do not support a breach of contract claim because the Metropolitan Government fulfilled its obligation under Metro. Code § 3.08.040(A)(3) to provide Ms. Reese "full information" regarding her rights and status. However, Mr. Reese relies on events occurring after July 1999 to support his breach of contract claim. On July 20, 2000, Aetna Life Insurance Company's manager of the Metropolitan Government's account wrote a letter to the Metropolitan Government

proposing a "one time exception" for employees currently on disability who had failed to qualify for the waiver of premium benefit within two years of taking disability retirement. The Metropolitan Government declined this offer, apparently because it would have cost over $10,000,000. The Metropolitan Government never informed the persons on disability retirement of Aetna's offer or of its decision to reject the offer.

Ms. Reese died in April 2001. In his complaint filed in July 2001, Mr. Reese asserts that the Metropolitan Government breached its contract by failing to inform Ms. Reese of Aetna's proposal to offer employee's like his wife an opportunity to qualify for the waiver of premium benefit. This claim fails on three grounds. First, the Metropolitan Government does not have either the statutory or contractual obligation to inform its employees of its negotiations and discussions with insurance companies regarding changes in group insurance benefits. Second, while the Metropolitan Government has an obligation to act reasonably when it is procuring group health insurance benefits for its employees, it was not acting unreasonably when it declined to incur an additional $10,000,000 expense in order to offer employees a "one time exception" to the requirements to qualify for the waiver of premium benefit. Third, the Metropolitan Government had no obligation under Metro. Code § 3 .08.040(A)(3) to inform disabled employees of the "one time exception" because it never became part of the employee benefit plan. Accordingly, the trial court properly determined that the Metropolitan Government was entitled to a dismissal of Mr. Reese's breach of contract claim as a matter of law.

## VI.

### THE BREACH OF CONTRACT CLAIMS OF MMES. GOOT, TAYLOR, AND DUKE

We now turn to the breach of contract claims of Mmes. Goot, Taylor, and Duke. The trial court granted a directed verdict for the Metropolitan Government at the close of their proof on the ground that they had failed to prove "the terms of the life insurance contract." Mmes. Goot, Taylor, and Duke assert that the trial court erred because the terms of the waiver of premium provision in the life insurance contract were not in dispute. For its part, the Metropolitan Government insists that the trial court erred by failing to direct a verdict on the ground that Mmes. Goot, Taylor, and Duke were not third-party beneficiaries

of their deceased spouses' group insurance policies. We have determined that the trial court properly declined to direct a verdict on the Metropolitan Government's third-party beneficiary claim but that the trial court erred by directing a verdict because of the surviving spouses' failure to prove the terms of the waiver of premium provision.

### A.

### The Surviving Spouses as Intended Third-Party Beneficiaries of Their Spouses' Group Life Insurance Benefits

*14 The Tennessee Supreme Court has adopted the "intent to benefit" test as set forth in the RESTATEMENT (SECOND) OF CONTRACTS § 302 (1981). The only third parties who may claim a legally enforceable interest in a contract are persons who the contracting parties intended to benefit. The court's test for determining whether a third party is an intended beneficiary provides:

A third party is an intended third-party beneficiary of a contract, and thus is entitled to enforce the contract's terms, if

(1) The parties to the contract have not otherwise agreed;

(2) Recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties; and

(3) The terms of the contract or the circumstances surrounding performance indicate that either:

(a) the performance of the promise will satisfy an obligation or discharge a duty owed by the promisee to the beneficiary; or

(b) the promisee intends to give the beneficiary the benefit of the promised performance.

*Owner-Operator Indep. Drivers Ass'n v. Concord EFS, Inc.,* 59 S.W.3d 63, 70 (Tenn.2001). An intended beneficiary's rights are measured by the contract itself, *United States Fid. & Guar. Co. v. Elam,* 198 Tenn. 194, 213-14, 278 S.W.2d 693, 702 (1955), thus courts must analyze third-party contract claims by construing the contract as a whole rather than in a piecemeal fashion.

*Benton v. Vanderbilt Univ.,* 137 S.W.3d 614, 619-20 (Tenn.2004).

The Metropolitan Government is obligated to provide all eligible employees with group life insurance coverage that contains a waiver of premium benefit. A life insurance policy is a mixture of contract and donative transfer, and when the policy is payable to someone other than the insured, it is a classic example of a third-party beneficiary contract. *Milbourne v. Conseco Servs., LLC,* 181 F.Supp.2d 466, 468 (D.Md.2002); *In re Estate of DeWitt,* 54 P.3d 849, 859 (Colo.2002); *In re Estate of England,* No. WILLS FOLIO 114375, 2000 WL 128854, at *4 (Del. Ch. Jan. 4, 2000); *Chicago White Metal Casting, Inc. v. Treiber,* 517 N.E.2d 7, 11 (Ill.Ct.App.1987). Once the insured names a beneficiary, there is no question that the employee, the employer, and the insurance company intend to benefit the named beneficiary.

When group insurance policies are involved, the courts generally view the employee as the intended third-party beneficiary of the contract for insurance between the employer and the insurance company. *Nidiffer v. Clinchfield R.R. Co.,* 600 S.W.2d at 246; *see also Roworth v. Minnesota Mut. Life Ins. Co.,* 674 F.2d 756, 758 (8th Cir.1982); *Aetna Life Ins. Co. v. Messier,* 173 F.Supp. 90, 91 (D.Pa.1959). Thus, the employees themselves have legally enforceable rights under the group insurance contracts. The courts have also extended the same rights to any beneficiary named by the employee as long as all the conditions of the policy have been fulfilled. *Bass v. John Hancock Mut. Life Ins. Co.,* 518 P.2d 1147, 1150 n. 4 (Cal.1974); *Keane v. Aetna Life Ins. Co.,* 91 A.2d 875, 883 (N.J.Super.Ct.1952); 13 WILLISTON ON CONTRACTS § 37:29, at 186.

**\*15** One of the principle reasons for purchasing life insurance is to confer a benefit on a third party following the death of the named insured. Accordingly, when the Metropolitan Government included life insurance among the group benefits available to its employees, it knew and intended that these death benefits would be paid upon the employee's death to the employee's beneficiary. It follows, therefore, that both the employee and the Metropolitan Government knew and intended that upon the death of the employee, the surviving spouse or other named beneficiary would be entitled to receive the death benefits as long as all the requirements for receiving these benefits had been fulfilled.

In light of the relationship between the employees and their beneficiaries, we conclude that surviving spouses of employees, as intended beneficiaries of the group life

insurance benefit, could step into the shoes of their former spouse to pursue their claim that the Metropolitan Government breached the employment contract by failing to provide "full information" regarding the waiver of premium benefit as required by Metro. Code § 3.08.040(A)(3). Therefore, the trial court did not err when it declined to grant the Metropolitan Government's motion for directed verdict predicated upon its claim that the surviving spouses were not intended third-party beneficiaries of their former spouses' group life insurance benefit.

**B.**

**The Surviving Spouses' Evidence Supporting Their Breach of Contract Claim**

The final issue involves the trial court's decision to direct a verdict for the Metropolitan Government because Mmes. Goot, Taylor, and Duke did not introduce a copy of the group life insurance contract containing the waiver of premium benefit. Mmes. Goot, Taylor, and Duke assert that the trial court erred because the Metropolitan Government had never denied the existence of the group life insurance contract containing a waiver of premium provision or what the terms of the waiver of premium provision were. We agree, in light of the state of the pleadings and the Metropolitan Government's representations regarding the terms of the waiver of premium benefit during the pretrial proceedings. Based on the facts of this case, Mmes. Goot, Taylor, and Duke were not required to introduce a copy of the group life insurance contract in order to make out a prima facie breach of employment contract claim.

**1.**

All three surviving spouses alleged in their amended complaint that the Metropolitan Government provided its employees with group life insurance that contained a waiver of premium benefit for disabled employees. They also alleged that their spouses were eligible for this benefit and that their spouses would have qualified for it had they been told about it. In addition, they alleged that the Metropolitan Government breached its employment contract with their spouses by failing to inform them of the waiver of premium benefit in a timely manner and that as a result of this breach of contract, they received only

$7,500 in death benefits as opposed to the $50,000 in death benefits they would have received had their spouse applied for the waiver of premium benefit in a timely manner.

**\*16** The Metropolitan Government never filed an answer to the amended complaint or any of the earlier complaints filed by Mmes. Goot, Taylor, and Duke. However, in October 2002, it filed a motion for summary judgment and statements of undisputed fact regarding each surviving spouse's claim. It supported the motion and statements with the depositions of each of the surviving spouses and with the affidavit of its Assistant Director of Human Resources regarding the group life insurance policy and the waiver of premium provision. In its statements of undisputed facts, the Metropolitan Government asserted:

> The Metropolitan Government provides life insurance coverage for its employees and former employees receiving a disability pension or a service pension.

> Active employees receive life insurance coverage equal to twice their annual salary to a maximum of $50,000. Former employees receiving a service or disability pension receive coverage of a[sic] $7,500.

> Employees who become disabled before the age of 60 can apply for [sic] a "waiver of premium" which, if approved, allows them to maintain their life insurance coverage at the same level they had as an active employee.

> In order to receive approval for the waiver of premium and maintain the higher coverage, a disabled former employee must be disabled within the definition set forth in the insurance policy and make application to the life insurance company within the appropriate time frame.

> The determination of whether a former employee qualifies for the waiver of premium benefit rests solely with the life insurance company.

The surviving spouses responded to the Metropolitan Government's statements of undisputed facts by stating that they did not dispute these facts. The case proceeded to trial after the trial court declined to find that the Metropolitan Government was entitled to a judgment as a matter of law on the surviving spouses' breach of employment contract claims.

At trial, the lawyer representing the Metropolitan Government conceded that the plaintiffs' spouses received group life insurance coverage when they were city employees and that this life insurance coverage contained a waiver of premium provision. However, the lawyer specifically declined to stipulate that the employees did not receive adequate notice of the waiver of premium benefit or that each of the surviving spouse's damages amounted to approximately $42,500. Thereafter, each of the surviving spouses testified (1) regarding her understanding of how the waiver of premium provision worked; (2) that her spouse either did not receive timely information regarding the waiver of premium benefit or received erroneous information regarding their eligibility for the benefit; (3) that her spouse would have applied for the waiver of premium benefit in a timely manner had he known about it; (4) that her spouse met all the requirements for the benefit; and (5) that as a result of her spouse's failure to submit a timely application for the waiver of premium benefit, she received a death benefit of $7,500 rather than the $50,000 benefit she would have otherwise received.[13] On cross-examination, each of the surviving spouses testified that they had not read the group life insurance contract and that they had gained their understanding of the operation of the waiver of premium provision from employees of the Metropolitan Benefit Board.

**\*17** The surviving spouses also presented the testimony of two former employees of the Metropolitan Benefit Board who described the Metropolitan Government's haphazard approach to informing disabled employees of the waiver of premium provision or how to qualify for it. During its cross-examination of these employees, the Metropolitan Government introduced into evidence one page of the thirteen-page letter purportedly given to all employees who qualified for a disability retirement. This letter contained the following statements regarding the waiver of premium provision:

> With the effective date of your disability pension, your life insurance, under coverage provided by The Metropolitan Government, will be reduced to $7,500 unless you are totally disabled. If you are totally disabled and are less than sixty (60) years of age, then you may apply for a waiver of premium and the amount of insurance that you had in effect as an employee will continue in effect. You are considered to be totally disabled if you are completely prevented by injury or sickness from doing, for pay or profit, any work for which you are fitted by education, training, and experience. The amount of your insurance coverage will be $7,500 at age 65.

> Should you die within the first (1st) year of being on a disability pension, the amount of insurance that was available to you as an employee is still in effect if it can be shown that you were totally disabled. If you are

totally disabled, you may continue to be covered for the amount that you received as an employee if you file proof of your disability within one (1) year of going on disability. If you wish to file such a claim, you should contact the Benefit Board Office and we will assist you in processing that application.

Thus, when the surviving spouses closed their case-in-chief, the following proof was before the jury: (1) that the Metropolitan Government offered group life insurance containing a waiver of premium provision to its employees; (2) that all city employees received life insurance coverage equal to twice their annual salary up to $50,000; (3) that the life insurance benefit for employees on disability retirement was $7,500; (4) that employees who became totally disabled before their sixtieth birthday were eligible for the waiver of premium benefit and that if they qualified for the benefit, their life insurance coverage would continue at the level it was when they were active employees; (5) that the spouses of each of the plaintiffs became disabled before their sixtieth birthday and that they were totally disabled; (6) that the Metropolitan Government was required to provide all its employees with "full information" of their rights and status regarding their benefits; and (7) that neither the employee spouses nor the plaintiffs were provided "full information" regarding the waiver of premium provision when they were approved for a disability retirement.

Following the close of the surviving spouses' case-in-chief, the Metropolitan Government moved for a directed verdict on six grounds. Two of these grounds were (1) that the plaintiffs had failed to prove the "elements" of the group life insurance contract and (2) that the plaintiffs had failed to present medical evidence demonstrating that their spouses would have qualified for the waiver of premium benefit had they applied for it in a timely manner. The trial court granted the Metropolitan Government a directed verdict on both of these grounds. While the court did not focus on the absence of medical evidence, it held that the surviving spouses had failed to prove what the qualifications for the waiver of premium benefit were and whether their spouses met these requirements because they failed to introduce a copy of the group life insurance contract.[34] The court stated that it believed that the jury would be left to speculate regarding the amount of the surviving spouses' damages unless they had a copy of the group insurance contract containing the waiver of premium provision.

2.

*18 The preparation and trial of this case by both lawyers leaves much to be desired. The chief shortcomings are the Metropolitan Government's failure to file an answer to the surviving spouses' complaint and the failure of the lawyer representing the surviving spouses to bring this significant oversight to anyone's attention before the close of the plaintiffs' case-in-chief.[35] The pleadings required by Tenn. R. Civ. P. 7 and 8 are not vestigial appendages to litigation. Their purpose is to provide notice of the parties' claims and defenses. ROBERT BANKS, JR. & JUNE F. ENTMAN, TENNESSEE CIVIL PROCEDURE § 5-4(a), at 5-41 (2004) ("TENNESSEE CIVIL PROCEDURE"). The purpose of Tenn. R. Civ. P. 8.04 is to ensure that the defendant's answer gives the plaintiff notice of those allegations in the complaint that are uncontested and that will not be an issue at trial. TENNESSEE CIVIL PROCEDURE, § 5-4(f), at 5-56. There is no question that the disputed factual and legal issues in this case were not brought into sharp focus because of the Metropolitan Government's failure to file an answer.

The shortcomings in the surviving spouses' case-in-chief cannot, in fairness, be attributed solely to the surviving spouses themselves. They are the result, in no small measure, of the Metropolitan Government's failure to file an answer and by the Metropolitan Government's pretrial assertions regarding the existence and terms of the group life insurance contract, particularly the waiver of premium provision. Had the Metropolitan Government denied the existence of the group life insurance contract containing the waiver of premium provision for disabled employees, which it did not, the surviving spouses would, most likely, have presented more detailed evidence regarding the existence and terms of the contract. Had the Metropolitan Government denied that the surviving spouses' understanding and interpretation of the waiver of premium provision, which it did not, the surviving spouses would, most likely, have presented more detailed evidence regarding the terms of the waiver of premium provision. Had the Metropolitan Government denied that their spouses' age or the extent of their spouses' disability would not have been sufficient to qualify for the waiver of premium benefit, which it did not, the plaintiffs would, most likely, have presented more detailed evidence supporting claim that their spouses qualified for the benefit.

However, not only did the Metropolitan Government fail to take issue with the surviving spouses' understanding of the waiver of premium provision, its portrayal of the provision throughout the proceedings leading up to the trial was essentially identical to the understanding of the surviving spouses. The Metropolitan Government's

posture throughout the pretrial proceedings would have led a reasonable person to infer that the Metropolitan Government was conceding the existence of the group life insurance contract containing the waiver of premium provision for disabled employees and the specific terms of the waiver of premium provision.

**\*19** A court's ability to address its workload fairly and efficiently depends in large measure on the consistency and clarity of the parties' claims and defenses. *Monroe County Motor Co. v. Tennessee Odin Ins. Co.,* 33 Tenn.App. 223, 231, 231 S.W.2d 386, 390 (1950) (holding that the rule preventing litigants from taking inconsistent positions is "necessary to the orderly dispatch of litigation"). Thus, litigants will not be permitted to play fast and loose with the courts or with their adversaries by taking inconsistent or contrary positions. *Johnston v. Cincinnati, N.O. & T.P. Ry.,* 146 Tenn. 135, 159, 240 S.W. 429, 436 (1922); *Webber v.. Webber,* 109 S.W.3d 357, 359 (Tenn.Ct.App.2003); *Cothron v. Scott,* 60 Tenn.App. 298, 304, 446 S.W.2d 533, 535-36 (1969).

The Metropolitan Government's claim that it was entitled to a directed verdict because the surviving spouses did not introduce a copy of the group life insurance contract containing the waiver of premium provision is inconsistent with its position during all the pretrial proceedings. This suit involves an alleged breach of an employment contract, not a group life insurance contract. There was no dispute prior to the trial regarding the existence or the terms of the group life insurance contract. The only possible disputes involved the adequacy of the employees' notice of the waiver of the premium provision, whether the plaintiffs' spouses met the age and disability requirements of the provision, and, if they did, the amount of the benefit. Thus, just as the Metropolitan Government's failure to file an answer prevented it from belatedly asserting a statute of limitations defense, its failure to deny the existence of the group life insurance contract or the terms of the waiver of premium provision should have undermined its request for a directed verdict on the ground that the surviving spouses did not establish the existence of the waiver of premium benefit by introducing a copy of the group life insurance contract.

The Metropolitan Government has always been in the best position to know the precise terms of the group life insurance contract and the waiver of premium provision. After all, it is one of the parties to the group life insurance contract, and the contract has been in its possession and under its control throughout the litigation. Its own employees testified regarding the relevant provisions of the contract, and their testimony was entirely consistent with the surviving spouses' testimony regarding their understanding of the contract. There was no material factual dispute regarding the operative provisions of the group life insurance contract or the waiver of premium provision. Accordingly, the Metropolitan Government was not entitled to a directed verdict on the surviving spouses' breach of employment contract claim.

During their case-in-chief, the surviving spouses presented proof (1) that each spouse was less than sixty years of age when he became disabled, (2) that each spouse was disabled enough to qualify for the waiver of premium benefit, (3) that each spouse would have qualified for the waiver of premium benefit had they been informed of the benefit in a timely manner, and, therefore, (4) that each spouse would have received the maximum $50,000 benefit rather than the $7,500 they actually received had the Metropolitan Government fulfilled its obligation to provide their spouses with "full information" regarding the waiver of premium provision in a timely manner.[36] No speculation is needed to arrive at the conclusion that the surviving spouses had been damaged by approximately $42,500 by virtue of the Metropolitan Government's alleged breach of the employment contract. This evidence is sufficient to withstand the directed verdict and to place the burden on the Metropolitan Government to prove (1) that the surviving spouses' understanding of the terms of the waiver of premium provision was incorrect, (2) that the employee spouses were too old to qualify for the waiver of premium benefit, (3) that the employee spouses were not disabled enough to qualify for the waiver of premium benefit, or (4) that the employee spouses' salaries were too low to qualify them for the maximum $50,000 benefit.

### VII.

**\*20** In summary, we affirm the dismissal of all surviving spouses' intentional tort claims and Mr. Reese's breach of contract claim. We reverse the summary judgment dismissing Ms. Jackson's breach of contract claim, as well as the directed verdict dismissing the breach of contract claims of Mmes. Goot, Taylor, and Duke. We remand the cases to the trial court for further proceedings consistent with this opinion, and we tax the costs of this appeal to the Metropolitan Government of Nashville and Davidson County.

Footnotes

1 Metropolitan Gov't of Nashville & Davidson County, Tennessee Code § 3.20.010 [hereinafter Metro. Code] provides covered employees with life insurance benefits "during all times that he [or she] is an eligible employee...."

2 Metro.Code § 3.20.030(C) states that "[w]aiver of premium benefits for disability occurring prior to age sixty shall be included [in the "life contract"]. The word 'disability' shall have the definition as is customary with the insurer and not as otherwise defined in the system."

3 The attorney representing Mmes. Goot, Taylor, and Duke had overlooked Tenn.Code Ann. § 29-20-307 (2000) vesting circuit courts with exclusive jurisdiction over claims filed under the Governmental Tort Liability Act.

4 Mmes. Goot, Taylor, and Duke filed an amended complaint on October 8, 2001 containing allegations similar to those contained in Ms. Jackson's complaint. Mr. Reese filed a similar amended complaint on January 14, 2002.

5 The Metropolitan Government never filed an answer to the complaint filed by Mmes. Goot, Taylor, and Duke, but no one discovered this oversight until the second day of trial on June 18, 2003. This revelation prompted the Metropolitan Government to file an answer to Mr. Reese's complaint on June 30, 2003.

6 Tenn. R. Civ. P. 7.02(1) requires that motions "state with particularity the grounds therefor...." *See Jennings v. Sewell-Allen Piggly Wiggly*, --- S.W.3d ----, ----, 2005 WL 2513976, at *1 (Tenn.2005).

7 The trial court is referring here to Aetna's proposal for the one-time grace period permitting disabled employees who had not qualified for the waiver of premium benefit to apply for the benefit.

8 Act of May 4, 1973, ch. 345, 1973 Tenn. Pub. Acts 1243.

9 After all, negligence provides a basis for liability independent of intent. RESTATEMENT (SECOND) OF TORTS § 282 cmt. b (1965); W. PAGE KEETON ET AL. PROSSER AND KEETON ON THE LAW OF TORTS § 28, at 160-61 (5th ed.1984) [hereinafter PROSSER AND KEETON ON THE LAW OF TORTS].

10 The court's discussion of continuation of immunity from suit for intentional torts was limited to Tenn.Code Ann. § 29-20-205(2). The statute, however, lists other intentional torts for which immunity is preserved. Tenn.Code Ann. § 29-20-205(5) (malicious institution of judicial or administrative proceedings); Tenn.Code Ann. § 29-20-205(6) (intentional misrepresentation). Presumably, a local government would also be immune from suit arising out of an assault or battery committed by a government employee in the context of a riot, unlawful assembly, or civil disturbance. *See* Tenn.Code Ann. § 29-20-205(7).

11 Metro.Code § 3.08.030(A).

12 Metro.Code § 3.08.030(B)(1).

13 Metro.Code § 3.20.010.

14 Metro.Code § 3.20.010.

15 Metro.Code § 3.20.030(C).

16 Metro.Code § 3.08.040(A)(3).

17 *See, e.g., PepsiCo, Inc. v. Central Inv. Corp.*, 268 F.Supp.2d 962, 967 (S.D.Ohio 2001); *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del.2005); *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 805 N.E.2d 957, 964 (Mass.2004); *Oakwood Village LLC v. Albertsons, Inc.*, 104 P.3d 1226, 1240 (Utah 2004).

18 *Fields v. Thompson Printing Co.*, 363 F.3d 259, 271 (3d Cir .2004); *Witt v. State, Dep't of Corr.*, 75 P.3d 1030, 1034 (Alaska 2003); *Grossman v. Columbine Med. Group*, 12 P.3d 269, 271 (Colo.Ct.App.1999); *Gilbert v. El Paso Co.*, 575 A.2d 1131, 1143 (Del.1990).

19   *Crews v. Buckman Labs. Int'l, Inc.,* 78 S.W.3d 852, 858 (Tenn.2002); *Baines v. Wilson County,* 86 S.W.3d 575, 578 (Tenn.Ct.App.2002).

20   For example, this court held that Tenn.Code Ann. § 56-7-601(c) [now codified at Tenn.Code Ann. § 56-7-2305(a)(2)(H) (2000) ] required an employer to notify its employees of their right to convert their group life insurance coverage to an individual policy. *Estate of Saffles v. Reliance Universal, Inc.,* 701 S.W.2d at 823-24.

21   Mmes. Goot and Jackson, whose spouses took disability retirement in 1985 and 1987 respectively, have testified that the Metropolitan Government did not inform them or their spouses of this benefit.

22   Mmes. Duke and Taylor, whose spouses took disability retirement in 1985 and 1992 respectively, have testified that their spouses inquired into their eligibility for the waiver of premium benefit when they retired but were told that they were not eligible for the benefit.

23   *Me News* is a publication of the Metropolitan Employee Benefit Board.

24   *McCroskey v. Bryant Air Conditioning Co.,* 524 S.W.2d at 492.

25   *Quality Auto Parts Co. v. Bluff City Buick Co.,* 876 S.W.2d 818, 821-22 (Tenn.1994).

26   *Pero's Steak & Spaghetti House v. Lee,* 90 S.W.3d at 624-25.

27   The discovery rule is intended to prevent the inequity that a strict application of the statute of limitations would produce. *Pero's Steak & Spaghetti House v. Lee,* 90 S.W.3d at 621.

28   All statutes of limitations are intended to preserve fairness and justice by preventing undue delay in filing lawsuits and thereby ensure that evidence is preserved and facts are not obscured by the passage of time. *Potts v. Celotex Corp.,* 796 S.W.2d at 681; *Owen v. Summers,* 97 S.W.3d 114, 123 (Tenn.Ct.App.2001).

29   *April Enters., Inc. v. KTTV,* 195 Cal.App.3d 421, 436 (Ct.App.1983) ("In the typical contract for purchase of widgets, for example, the buyer is well aware the contract has been breached when the date for delivery arrives and he has not received his widgets. Similarly, the seller knows when payment is due under the contract. If that time passes without receipt of the amount due he is easily aware that the contract has been breached.").

30   *See, e.g., Hunton v. Guardian Life Ins. Co.,* 243 F.Supp.2d 686, 698-99 (S.D.Tex.2001); *City of Philadelphia v. One Reading Ctr. Assocs.,* 143 F.Supp.2d 508, 526 (E.D.Pa.2001); *Bauman v. Day,* 892 P.2d 817, 827-28 (Alaska 1995); *Walk v. Ring,* 44 P.3d 990, 999 (Ariz.2002); *April Enters, Inc. v. KTTV,* 195 Cal.Rptr. at 437; *Marcucilli v. Boardwalk Builders, Inc.,* No. CIV.A. 99C-02-007, 2002 WL 1038818, at *4 (Del.Super. May 16, 2002); *Dovenmuehle, Inc. v. Lawyers Title Ins. Corp.,* 478 So.2d 423, 424-25 (Fla.Dist.Ct.App.1985); *Strauser v. Westfield Ins. Co.,* 827 N.E.2d 1181, 1185 (Ind.Ct.App.2005); *Poffenberger v. Risser,* 431 A.2d 677, 680 (Md.1981); *Snortland v. State,* 615 N.W.2d 574, 577 (N.D.2000); *Maher v. Tietex Corp.,* 500 S.E.2d 204, 207 (S.C.Ct.App.1998); *Gibson v. Ellis,* 58 S.W.3d 818, 823 (Tex.App.2001); *Architechtonics Constr. Mgmt., Inc. v. Khorram,* 45 P.3d 1142, 1147 (Wash.Ct.App.2002).

31   The inherently undiscoverable requirement is met when the injured party is unlikely to discover the wrong during the limitations period despite due diligence. To be inherently undiscoverable, the wrong and injury must be unknown to the plaintiff because of their very nature and not because of any fault of the plaintiff. *In re Coastal Plains, Inc.,* 179 F.3d 197, 214-15 (5th Cir.1999).

32   After all, the Metropolitan Council imposed on the Metropolitan Government the obligation to notify employees of their rights and benefits because the Council appreciated the complexity of the benefit plans and understood that most employees would be unable to discover the information on their own.

33   While none of the surviving spouses testified about the income their spouse was earning when he became disabled, their testimony that they would have received the $50,000 death benefit permits an inference that all of the surviving spouses were earning $25,000 per year or more when they became disabled.

34   This decision appears to be premised on the best evidence rule, Tenn. R. Evid. 1002, even though the Metropolitan Government did not make a best evidence objection during the surviving spouses' case-in-chief.

35    Tenn. R. Civ. P. 8.04 provides that averments in a pleading to which a responsive pleading is required are deemed admitted when not denied in the responsive pleading. However, when no responsive pleading is filed, the opposing party must invoke the default judgment procedures in Tenn. R. Civ. P. 55 rather than wait until trial and invoke Tenn. R. Civ. P. 8.04. *Smith v. Smith,* 643 S.W.2d 320, 323 (Tenn.1982); *Edwards v. Edwards,* 501 S.W.2d 283, 290 (Tenn.Ct.App.1973); *see also Story v. Lanier,* 166 S.W.3d 167, 182-83 (Tenn.Ct.App.2004).

36    We have already pointed out that the surviving spouses' testimony that they would have received $50,000 is premised on the reasonable inference that each of the spouses were earning $25,000 or more each year while they were active employees.

---

**End of Document**                                     © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Rader v. ING Bank fsb, Not Reported in F.Supp.2d (2010)

2010 WL 2403058
Only the Westlaw citation is currently available.
United States District Court,
D. Delaware.

Larry W. RADER, Plaintiff,
v.
ING BANK FSB, et al., Defendants.
Larry W. Rader, Plaintiff,
v.
ING Groep, N.V., et al., Defendants.
Larry W. Rader, Plaintiff,
v.
Sharebuilder Securities Corporation, et al.,
Defendants.

Civ. Nos. 09–340–SLR/LPS, 09–544–SLR/LPS,
09–781–SLR/LPS. | June 10, 2010.

**Attorneys and Law Firms**

Larry W. Rader, Wausau, WI, pro se.

Lisa Marie Zwally Brown, Richard Montgomery
Donaldson, Montgomery, McCracken, Walker & Rhoads,
Wilmington, DE, for Defendants.

**Opinion**

**MEMORANDUM ORDER**

SUE L. ROBINSON, District Judge.

**\*1** At Wilmington this 10th day of June, 2010, having
considered the Report and Recommendation issued by
Magistrate Judge Leonard P. Stark on April 7, 2010,[1] the
parties' objections thereto,[2] and having reviewed the
record de novo pursuant to 28 U.S.C. § 28 U.S.C. §
636(b)(1)(B) and Fed.R.Civ.P. 72(b)(3);

IT IS ORDERED that the objections lodged by plaintiff
and defendants are overruled, and the Reports and
Recommendations are accepted and adopted for the
reasons that follow.

1. **Standard of Review.** When reviewing the decision of
a magistrate judge on a dispositive matter, the court
conducts a de novo review. 28 U.S.C. 636(b)(1)(B);
Fed.R.Civ.P. 72(b)(3). Motions for summary judgment
and motions to dismiss are considered dispositive matters
and, therefore, the findings and conclusions of the
magistrate judge in connection with such a motion are
reviewed de novo. *Id.* The court may accept, reject, or
modify the recommendations of the magistrate judge. The
court may also receive further evidence or return the
matter to the magistrate judge with instructions for
proceedings. *Id.*

2. **Objections.** Plaintiff contends that Judge Stark's
factual and legal findings are incorrect and urges this
court to review the record, including his filings.
Defendants object to Judge Stark's recommendation to
delay consideration of whether any discovery will be
necessary in connection with the portion of defendants'
counterclaim for breach of contract seeking
reimbursement of attorneys fees and their request that
plaintiff be barred from filing any additional lawsuits
against them until after the court rules on objections to his
findings. Defendants also object to Judge Stark's denial of
their requests for sanctions and fees.

3. **Discussion.** Reviewing the Reports and
Recommendations, de novo, with respect to the objections
lodged, the court concludes that Judge Stark did not err in
his findings with respect to plaintiff's cases and his
conclusions regarding sanctions and fees. It is evident that
Judge Stark thoughtfully and carefully reviewed the
record against the appropriate authority and positions of
the parties. The court agrees and fully adopts the rationale
set forth in the Reports and Recommendations.

Footnotes

1    Addressing 23 pending motions, Judge Stark recommended that: (1) defendants be granted judgment on plaintiff's claims in all
     three cases; (2) various discovery motions be denied; (3) defendants' motion to sanction plaintiff for failure to appear at his
     deposition be granted; and (4) defendants' motion for other sanctions be denied. (D.I.79)

2    Because the cases are not consolidated, identical filings have been made in each individual case. For simplicity, however, the
     court's reference to docket items ("D.I.") will be from the first captioned action, *Rader v. ING Bank,* Civ. No. 09–340–SLR/LPS.

**Rader v. ING Bank fsb, Not Reported in F.Supp.2d (2010)**

[3]     Although defendants point out that plaintiff is an attorney and seasoned litigator, he is proceeding, in these actions, pro se. (D.I.80) Judge Stark recognized this unique situation and nonetheless found Rule 11 sanctions inappropriate.

**End of Document**                                     © 2013 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 598567
Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee.

Laurence B. KANDEL, M.D.
v.
The CENTER FOR UROLOGICAL TREATMENT
AND RESEARCH, P.C., Ralph C. Benson, Jr.,
M.D., L. Dean Knoll, M.D., and The Institute for
Urological Research.

No. M2000-02128-COA-R3-CV. | April 17, 2002.

An Appeal from the Circuit Court for Davidson County,
No. 98C-1987; Barbara N. Haynes, Judge.

**Attorneys and Law Firms**

Alfred H. Knight and William R. Willis, Willis & Knight,
Nashville, Tennessee, for the appellant Laurence B.
Kandel, M.D.

R. Dale Grimes, Bryan E. Larson, and Andrea Taylor
McKellar, Bass, Berry & Sims, Nashville, Tennessee, for
the appellees The Center for Urological Treatment and
Research, P.C., Ralph C. Benson, Jr., M.D., L. Dean
Knoll, M.D., and The Institute for Urological Research.

**Opinion**

## OPINION

HOLLY K. LILLARD, J., delivered the opinion of the
court, in which W. FRANK CRAWFORD, P.J., and
DAVID R. FARMER, J., joined.

HOLLY K. LILLARD, J.

*1 This is a breach of contract case. The plaintiff
physician entered into an employment contract with the
defendant physician's group. The contract provided that
the physician would work for the group for one year, and
that the parties would then "negotiate in good faith" to
give the employee physician the opportunity to purchase
stock in the group. At the end of the physician's first year
of employment, the parties negotiated, but reached an

impasse. Subsequently, negotiations ceased, and the
physician's employment was terminated. He filed suit
against the group, alleging that the defendants breached
the contract to "negotiate in good faith," and that the
defendants committed promissory fraud in inducing him
into signing the employment agreement. The trial court
granted summary judgment in favor of the defendants on
both counts. The physician now appeals. We affirm. Even
if Tennessee recognizes a cause of action for breach of an
agreement to negotiate in good faith, the evidence does
not demonstrate such a breach, and does not establish
promissory fraud.

This is a breach of contract case. In the spring of 1996,
plaintiff/appellant Laurence B. Kandel, M.D.
("Dr.Kandel"), was engaged in the academic practice of
urology in the state of New York. During that time, Dr.
Kandel entered into negotiations with defendant/appellee
Ralph Benson, M.D. ("Dr.Benson"), and
defendant/appellee Dean Knoll, M.D. ("Dr.Knoll"), the
sole shareholders in Defendant/Appellee The Center for
Urological Treatment and Research, P.C. ("CUTR"),
regarding Dr. Kandel joining CUTR as an employee in
the practice of urology.

In July 1996, the parties executed a contract, effective as
of September 15, 1996. The contract contained the
following provision:

> 10. *Agreement to Negotiate in*
> *Good Faith Toward Purchase of*
> *Equity Ownership.* The
> Employer agrees that in the
> event Employee remains
> continuously employed by
> Employer for a period of one (1)
> year and has achieved Board
> Certification through the
> American Board of Urology,
> *Employer will negotiate in good*
> *faith with Employee to allow*
> *Employee to purchase from*
> *Employer that number of shares*
> *of Employer's stock which will*
> *permit Employee to own the*
> *same number of shares as the*
> *stockholder holding the most*
> *shares of Employer's stock at*
> *that time.* Employer anticipates
> that the purchase price of such
> stock shall be based on the
> GAAP book value of the
> Employer as of the date of the

purchase.

(Emphasis added). Thus, the contract contained a provision requiring the parties to "negotiate in good faith" the sale to Dr. Kandel of an equal ownership share in CUTR at the expiration of one year.

Dr. Kandel remained Board certified, as required under his agreement, and completed his first year of practice at CUTR. Toward the end of his first year, Dr. Kandel raised to Drs. Benson and Knoll the issue of becoming a partner in CUTR pursuant to the terms of the contract. Dr. Kandel alleges that Drs. Benson and Knoll initially told him that he would have to wait another year before he became eligible to buy into the practice. When Dr. Kandel insisted that he had a contractual right to enter into good faith negotiations for the purchase of CUTR stock, the parties began to negotiate Dr. Kandel's buy-in.

**\*2** Beginning in September 1997, CUTR made the first of several offers to Dr. Kandel. The parties agreed on many terms of the buy-in, such as the formula to be used in determining the amount of Dr. Kandel's compensation, the formula to be used to calculate the amount of Dr. Kandel's buy-in, and the terms of the covenant not to compete. Regarding the amount of Dr. Kandel's buy-in, the parties contemplated that Dr. Kandel would buy his stock for an amount equal to one-third of the group's net asset value (assets less liabilities). This would total approximately $141,000, based on a valuation of the group that included over $500,000 in accounts receivable. The parties disagreed, however, on the method for calculating the stock redemption value. CUTR proposed that, upon termination of Dr. Kandel's employment, he would sell his stock to CUTR for its book value "provided that no value shall be assigned to accounts receivable." At the time of the negotiations, eliminating accounts receivable from the equation would have caused the book value of the stock to drop to an amount below zero. However, under CUTR's proposal, if Dr. Kandel were terminated he would have been entitled to a "severance pay" in an amount equal to 90% of the accounts receivable attributable to the services rendered by Dr. Kandel.

Dr. Kandel refused CUTR's proposal, asserting that it was not made in good faith because it required him to pay $141,000 for stock that would be essentially worthless if he were required to immediately redeem it. In response, CUTR defended its proposal to Dr. Kandel as it related to the stock redemption terms. In a letter to Dr. Kandel's attorney dated November 12, 1997, counsel for CUTR explained:

[I]t is [ ] true that Dr. Kandel could be fired the day

after he buys into CUTR. However, Dr. Benson's and Dr. Knoll's executed Employment and Redemption Agreements also contain similar "without cause" termination provisions that allow CUTR to terminate their employment without cause at any time without requirement of prior notice.

\* \* \*

However, [you] erroneously assume[ ] that Dr. Kandel would receive $0 if his employment with CUTR was terminated the day after he completed his buy-in or at any other time. To the contrary, Dr. Kandel would potentially receive two payments. First, Dr. Kandel, if terminated, is entitled to receive 90% of his accounts receivable.... This payment would result in a large payment to Dr. Kandel. Specifically, since Dr. Kandel's accounts receivable at the end of October approximated $93,000, Dr. Kandel would be entitled to a payment of approximately $84,000. It is important to note, however, that Dr. Kandel's current accounts receivable are significantly deflated solely because he took a considerable amount of time off during September. A more representative example may be Dr. Benson's accounts receivable as of October 31, 1997, which approximated $152,000. Under a similar provision in Dr. Benson's Employment and Redemption Agreement, Dr. Benson, if terminated, would be entitled to a payment of approximately $137,000, or 90% of his accounts receivable.

> **\*3** Even though this payment may not equal or surpass Dr. Kandel's buy-in amount, it represents a fair price of admission to an established and highly regarded medical practice. It is also important to note that Dr. Kandel is not being asked to pay any amount for goodwill or name, which direct benefit he will receive immediately upon becoming a shareholder without any direct cost to him.

(Footnote omitted).
In a letter dated November 26, 1997, Dr. Kandel made a counter-proposal to CUTR, proposing, among other things, that the redemption value of his stock be determined according to the same formula utilized in the purchase of his stock. Significantly, Dr. Kandel's proposal sought to recover this stock redemption value *in addition to* the "severance pay" provision in CUTR's proposal. In a letter dated December 4, 1997, CUTR rejected that request, asserting that "[s]uch an unfair provision would allow Dr. Kandel to double dip into

CUTR's accounts receivable" and would give Dr. Kandel rights greater than those held by the other stockholders, Dr. Benson and Dr. Knoll. The December 4 letter stated that it was CUTR's "final offer" to Dr. Kandel, and was set to expire on December 8, 1997. In response, Dr. Kandel argued that his proposal was fair in light of the fact that CUTR could terminate him without cause. Dr. Kandel also expressed regret that CUTR would not agree to give him a position on the group's board of directors, nor the right of first refusal to purchase the group in the event a third party offered to buy it. On December 8, 1997, because Dr. Kandel would not accept CUTR's "final offer," his employment was terminated.

On July 20, 1998, Dr. Kandel sued CUTR, Dr. Benson, Dr. Knoll, and The Institute for Urological Research ("IUR"), a non-profit corporation in which Drs. Benson and Knoll have an interest. In count one of the complaint, Dr. Kandel alleged that CUTR, Dr. Benson, and Dr. Knoll breached their contract to negotiate in good faith with Dr. Kandel to allow him to purchase stock in the group. In count two, Dr. Kandel alleged that CUTR breached its obligation under his employment contract to pay him certain bonuses described in the agreement. Finally, in count three, Dr. Kandel asserted a claim for promissory fraud alleging that the Defendants induced him into signing the employment contract by promising that he could become a shareholder in IUR at the end of his first year of employment. Dr. Kandel asserted that Drs. Benson and Knoll "knew said promises were false when they made them." Dr. Kandel sought compensatory damages including, but not limited to, lost salary, lost profits, lost bonuses, and the loss on the sale of his New York residence.

In response, the defendants filed a motion for summary judgment. On January 15, 1999, the trial court held a hearing on the motion. On February 4, 1999, the trial court granted summary judgment to the defendants on count one (breach of contract) and count three (promissory fraud) of the complaint, but denied summary judgment with respect to count two (employment bonus). On August 23, 2000, the trial court entered an order noting that the claim in count two had been settled and making the February 4 order final and appealable. Dr. Kandel now appeals the order entered on February 4, 1999.

*4 Dr. Kandel argues on appeal that the trial court erred in granting summary judgment in favor of the defendants. He claims that a contract to "negotiate in good faith" is enforceable in Tennessee, and that the facts of this case would support a finding that the defendants breached their duty under his employment agreement to negotiate in good faith. Dr. Kandel further argues that the facts of this case would support his claim for damages under a theory of promissory estoppel.

We review the trial court's grant of summary judgment *de novo* with no presumption of correctness. *Warren v. Estate of Kirk,* 954 S.W.2d 722, 723 (Tenn.1997) (quoting *Bain v. Wells,* 936 S.W.2d 618, 622 (Tenn.1997)). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.03. We must view the evidence in a light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences. *Warren,* 954 S.W.2d at 723.

Dr. Kandel first argues that a contract to "negotiate in good faith," such as the provision in his employment contract, is enforceable in Tennessee.[1] He notes that, even where a contract does not contain a specific provision to that effect, every contract is subject to an implied covenant of reasonable and good faith performance. *See Covington v. Robinson,* 723 S.W.2d 643, 645-46 (Tenn.Ct.App.1986) (concluding that the purchaser's refusal to perform in good faith constituted a default of their contractual obligations); *see also Safeco Ins. Co. of Am. v. City of White House,* 36 F.3d 540, 548 (6th Cir.1994) (relying on the proposition that, according to Tennessee law, "standards of good faith and fair dealing [are] implied in every contract," quoting *Misco, Inc. v. United States Steel Corp.,* 784 F.2d 198, 203 (6th Cir.1986)).

Dr. Kandel also cites two cases in which marital dissolution agreements requiring the parties to "negotiate in good faith" potential modifications relating to child support, alimony, and property allocation were enforced. *Bruce v. Bruce,* 801 S.W.2d 102, 103-04 (Tenn.Ct.App.1990); *Threadgill v. Threadgill,* 740 S.W.2d 419, 424 (Tenn.Ct.App.1987). In *Bruce,* the husband argued that the agreement to negotiate was an invalid "agreement to agree." This argument was rejected because the marital dissolution agreement "is not an agreement to agree in the future. A 'contract may provide for modification, and contracts which provide for subsequent changes therein are not unusual.' " *Bruce,* 801 S.W.2d at 106. In *Threadgill,* as in *Bruce,* the parties' duty to negotiate modifications in the original marital dissolution agreement arose if the parties experienced a change in circumstances warranting such a modification. The appellate court determined that the parties' circumstances had not changed so as to trigger any

obligation to negotiate. *Threadgill,* 740 S.W.2d at 424. Consequently, the *Threadgill* court did not reach the issue of whether the provision to "negotiate in good faith" was enforceable.

**\*5** CUTR argues that the current jurisprudence indicates an unwillingness to enforce an agreement to "negotiate in good faith."[2] In support, CUTR cites *Engenius Entm't, Inc. v. Herenton,* 971 S.W.2d 12 (Tenn.Ct.App.1997). In *Engenius,* the plaintiff developer was selected by the defendants City of Memphis and Shelby County to develop leasehold space in The Pyramid, a public arena in downtown Memphis. The defendants' written Request for Proposals ("RFP") provided that, upon the selection of a developer, the specific rent structure would be negotiated between the parties. The defendants later demanded a $50,000 non-refundable fee with the developer for the right to negotiate a lease with the defendants. *Engenius,* 971 S.W.2d at 15-16. The plaintiff developer refused to pay the fee, so the defendants terminated further negotiations and told the plaintiff that it would not be used as the contractor on the project. *Id.* The plaintiff developer filed a lawsuit alleging breach of contract, claiming, among other things, that the defendants breached their "obligation to deal with [plaintiff] fairly and in good faith to proceed with the development of the Leasehold Space of the Pyramid." *Id.* at 17.

The trial court dismissed the complaint. On appeal, the appellate court held that the RFP requiring the parties to negotiate was not an enforceable agreement. *Id.* at 17-18. The court reasoned that when parties agree to prepare and execute a final written agreement, "it is necessary that agreement shall have been expressed on all essential terms that are to be incorporated in the document.... The so-called 'contract to make a contract' is not a contract at all." *Id.* (quoting 1 Arthur L. Corbin, et al., *Corbin on Contracts* § 2.8, at 133-34 (Rev. ed.1993) (footnotes omitted)). Because the parties had not previously agreed on the essential terms of the rent structure, the court held that "no agreement existed between the parties regarding EnGenius's development and lease of The Pyramid space.... At most, the documents evinced *an agreement between the parties to negotiate in good faith to reach a final lease agreement." Id.* at 18 (emphasis added).

The *Engenius* court then cited cases holding that agreements to "negotiate in good faith" are enforceable under certain circumstances. *See,* for example, *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69 (2d Cir.1989) (under New York law). In *Arcadian Phosphates,* the Second Circuit Court of Appeals, interpreting New York law, described two types of preliminary agreements. In the first type, the parties agree

to later formalize a contract about which there has been complete agreement on all of the essential issues. In the second type, the parties have committed themselves to some of the major terms, but other essential terms remain to be negotiated. *Arcadian Phosphates,* 884 F.2d at 72. Under New York law, the existence of open terms in the second type of preliminary agreement is not fatal to its enforcement. *See Teachers Ins. & Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491, 498 (S.D.N.Y.1987). This is because the parties are bound to their ultimate contractual objective. *Id.* In the second type of preliminary agreement, the parties are bound "in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach a final agreement within the scope that has been settled in the preliminary agreement." *Id., quoted in Arcadian Phosphates,* 884 F.2d at 72.

**\*6** In the instant case, CUTR asserts that *Engenius* stands for the proposition that an agreement to negotiate is enforceable only if it is the first type of preliminary agreement, i.e. only if the essential terms of the contemplated agreement have already been determined. Indeed, some courts adhere to this general rule. *See, e.g., Mohrenweiser v. Blomer,* 573 N.W.2d 704, 706-07 (Minn.Ct.App.1998) (holding that an agreement to "negotiate in good faith," like a letter of intent and any other type of agreement to negotiate in the future, is unenforceable). Other courts conclude that such a provision is unenforceable because of the vagueness of such a contract. *See, e.g., Ohio Calculating, Inc. v. CPT Corp.,* 846 F.2d 497, 501 (8th Cir.1988) (under Minnesota law, determining that a contract to negotiate is unenforceable because it is vague and uncertain as to the intent of the parties). Still other courts refuse to enforce a contract to "negotiate in good faith" because of the difficulty in ascertaining an appropriate remedy for the breach of such a clause. *See, e.g., Jenks v. Jenks,* 385 S.W.2d 370, 376 (Mo.Ct.App.1964) (holding that "equity will not indulge the futility of ordering the parties to 'meet together' to 'discuss in good faith' the very problem on which they have demonstrated their inability to agree").

The instant case involves the second type of preliminary agreement, an agreement to "negotiate in good faith" where some essential terms are left to negotiation. The parties agreed that Dr. Kandel would be eligible to buy-in after one year of employment, that he would be entitled to purchase one third of the group's stock, and that the stock price would be determined according to the GAAP book value as of the date of purchase. However, the stock redemption value, among other items, had not been negotiated prior to the signing of the original employment

agreement.

I n this case, we need not determine whether such a preliminary agreement would be enforceable under Tennessee law.[3] Even if Tennessee courts would recognize a cause of action based on such a provision, our review of the record indicates that no reasonable trier of fact could find that the defendants breached their duty under the circumstances.

Dr. Kandel maintains that the defendants breached their duty to bargain in good faith because they insisted on terms that were unreasonable on their face. "[A] party might breach its obligation to bargain in good faith by unreasonably insisting on a condition outside the scope of the parties' preliminary agreement." *A/S Apothekernes Laboratorium v. I.M.C. Chemical Group, Inc.,* 873 F.2d 155, 158 (7th Cir.1989). In his pleadings, Dr. Kandel asserts that, although the defendants adopted minor terms that he requested, their "proposals always contained terms and conditions which allowed CUTR to terminate Dr. Kandel without cause at any time thereby causing him to forfeit more than $141,000 and thereby precluding him from competing with the Defendants in the middle-Tennessee area for one year." Thus, Dr. Kandel describes the "worst-case scenario," arguing that he could buy into the company for approximately $141,000, be fired without cause the very next day, be required to forfeit the $141,000 paid for his stock, and be prevented from practicing urology within a 50 mile radius for one year.

*7 However, a number of significant factors are omitted from Dr. Kandel's analysis. First, under his own "worst-case scenario," though he would not receive compensation for his stock, he would be entitled to receive compensation under the "severance pay" provision of the agreement, which he acknowledges is a substantial amount. Second, under the terms proposed by CUTR, if Dr. Kandel remained with the group over any length of time, he would likely receive an amount for his stock in addition to the severance pay. In addition, although Dr. Kandel notes CUTR's proposed contract would prevent him from competing with the defendants within a 50-mile radius for a period of one year from termination, that non-compete provision was actually negotiated by Dr. Kandel and included at his request.[4] Under Dr. Kandel's proposal, his stock redemption value would be calculated in the same manner as the stock purchase price. Under this proposal, Dr. Kandel would be entitled, upon termination, to receive his stock value ($141,000) *in addition to* the severance pay, which would result in a substantial windfall to Dr. Kandel. It must also be noted that the contract first proposed by CUTR to Dr.

Kandel was essentially the same in all pertinent respects as the agreements signed by Drs. Benson and Knoll. Dr. Kandel requested several minor changes that were adopted by the defendants, including adding a provision for a specific level of salary, allowing Dr. Kandel a minimum of four weeks paid vacation, and allowing Dr. Kandel to participate in CUTR's employer-sponsored group insurance plans and any group-sponsored qualified retirement plan. Under these circumstances, we must conclude that no trier of fact could reasonably find that the defendants negotiated in bad faith. Thus, we affirm the trial court's grant of summary judgment in favor of the defendants on count one of the complaint.

Dr. Kandel next argues on appeal that the trial court erred in granting the defendants summary judgment on count three of his complaint, purportedly based on the theory of promissory estoppel. A "claim of promissory estoppel is not dependent upon the existence of an express contract between the parties." *Engenius,* 971 S.W.2d at 19. Under that theory of recovery, a plaintiff can recover if, by the promises of another, he is induced into changing his situation. "This theory of recovery is sometimes referred to as 'detrimental reliance' because, in addition to showing that the defendant made a promise upon which the plaintiff reasonably relied, the plaintiff must show that this reliance resulted in detriment to the plaintiff." *Id.* at 19-20 (footnote omitted). Dr. Kandel argues that the defendants are liable to him under this theory because they made oral promises to him which induced him to move his family from New York to Tennessee and to incur substantial expenses related to his relocation.

In reviewing Dr. Kandel's complaint, however, he alleges that the defendants are liable to him on a theory of promissory fraud, rather than promissory estoppel. In count three of the complaint, Dr. Kandel asserts that the defendants induced him into signing the employment contract with CUTR by promising him that he could become a shareholder in IUR at the end of his first year of employment. Dr. Kandel states in his complaint that Drs. Benson and Knoll "knew said promises were false when they made them." In other words, Dr. Kandel asserts a claim for "fraud in the inducement."

*8 The Tennessee Supreme Court "has not adopted the doctrine of promissory fraud in Tennessee, but has merely indicated a willingness to consider adopting the rule 'in a proper case where justice demands.' " *Farmers & Merchants Bank v. Petty,* 664 S.W.2d 77, 80 (Tenn.Ct.App.1983) (quoting *Fowler v. Happy Goodman Family,* 575 S.W.2d 496, 499 (Tenn.1978)). To establish a claim for promissory fraud, a claimant must show that, at the time the promise was made, the person making the

promise had no intention to perform. *Fowler,* 575 S.W.2d at 499. The party alleging promissory fraud bears the burden of proving that the defendants who made the promise had no present intent to perform at the time the promise made. *Brungard v. Caprice Records, Inc.,* 608 S.W.2d 585, 590 (Tenn.Ct.App.1980). The Tennessee Supreme Court is unwilling to apply the doctrine "except in those cases where there is direct proof of a misrepresentation of actual present intention." *Farmers & Merchants Bank,* 664 S.W.2d at 82.

In this case, the record contains no evidence to support Dr. Kandel's claim that the defendants fraudulently induced him into signing his employment agreement. There is no evidence to show that the defendants either made any misrepresentation with respect to IUR, or that any such misrepresentations were known to be false. In fact, the employment agreement signed by Dr. Kandel

indicates that the parties would agree, after a year, to negotiate in good faith "to purchase from Employer that number of shares of Employer's stock which will permit Employee to own the same number of shares as the stockholder holding the most shares of Employer's stock at that time." Under the contract, "Employer" was CUTR, with no reference made to IUR. Therefore, the trial court did not err in granting summary judgment to the defendants on Dr. Kandel's claim for relief based on promissory fraud.

The decision of the trial court is affirmed. Costs are to be taxed to the appellant, Laurence B. Kandel, M.D., and his surety, for which execution may issue if necessary.

Footnotes

| 1 | The trial court's order did not indicate the basis for its dismissal of Dr. Kandel's claim. In light of the court's disposition of the matter, the parties both address the issue of enforceability on appeal. |
|---|---|
| 2 | The arguments of CUTR apply to all defendants except where otherwise indicated. |
| 3 | As we discussed above, Dr. Kandel cites authority indicating that the duty to bargain in good faith is implicit in all contracts under Tennessee law. The duty imposed by a contractual agreement to "negotiate in good faith," however, is distinguishable from the common-law duty to bargain in good faith. *See Channel Home Centers v. Grossman,* 795 F.2d 291, 299 n. 8 (3d Cir.1986); *Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 887 F.Supp. 1014, 1017 (N.D.Ill.1995). Thus, the authority on which Dr. Kandel relies does not support the position that Tennessee courts would enforce agreements to "negotiate in good faith." |
| 4 | The non-compete agreement in Dr. Benson and Dr. Knoll's contracts, and the one proposed to Dr. Kandel, provides that the physicians cannot compete within three years from the time they purchase their stock. |

**End of Document**                     © 2013 Thomson Reuters. No claim to original U.S. Government Works.